STEPHEN G. LARSON (SBN 145225)
slarson@larsonobrienlaw.com
JERRY A. BEHNKE (SBN 180462)
jbehnke@larsonobrienlaw.com
MELISSA A. MEISTER (SBN 296744)
mmeister@larsonobrienlaw.com
**LARSON O'BRIEN LLP**
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
Telephone: 213.436.4888
Facsimile: 213.623.2000

Attorneys for Defendant
DAVID GARCIA HERRERA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. ED CR No. 15-0315(B)-JGB |
|---|---|
| Plaintiff, | **DEFENDANT DAVID GARCIA HERRERA'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT; DECLARATION OF JERRY A. BEHNKE; EXHIBITS** |
| v. | |
| DAVID GARCIA HERRERA, | |
| Defendant. | Date: August 23, 2016<br>Time: 9:00 a.m.<br>Judge: Hon. Jesus G. Bernal |

Defendant David Garcia Herrera, by and through his counsel of record, Stephen G. Larson, Jerry A. Behnke, and Melissa A. Meister, hereby moves this Court to immediately dismiss the Indictment based on the prosecution's misconduct during and before this trial. Because of the flagrant and egregious nature of this misconduct, the defense respectfully requests this Court to suspend further proceedings in this trial until this motion is addressed.

This motion is based on the attached Memorandum of Points and Authorities, Declaration of Jerry A. Behnke, and Exhibits, as well as the record in this trial and

such further argument and evidence as may be adduced at any hearing on this motion.

Dated: August 21, 2016  **LARSON O'BRIEN LLP**

By: /s/ Stephen G. Larson
STEPHEN G. LARSON
JERRY A. BEHNKE
MELISSA A. MEISTER

Attorneys for Defendant
DAVID GARCIA HERRERA

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND FACTS ......................................................................................2

III. THE GOVERNMENT'S MISCONDUCT ...........................................................4

IV. ARGUMENT .........................................................................................................5

V. CONCLUSION ....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Berger v. United States*
  295 U.S. 78 (1935) .................................................................................................. 10

*Gaither v. United States*
  413 F.2d 1061 (D.C. Cir. 1969) ............................................................................. 11

*Napue v. Illinois*
  360 U.S. 264 (1959) .................................................................................................. 8

*United States v. Chapman*
  524 F.3d 1073 (9th Cir. 2008) ................................................................................ 10

*United States v. Kojayan*
  8 F.3d 1315 (9th Cir. 1993) ............................................................................. 10, 11

*United States v. Weatherspoon*
  410 F.3d 1142 (9th Cir. 2005) ................................................................................ 16

**Other Citations**

USAM, Criminal Resource Manual § 534 ................................................................. 4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The government, through Assistant United States Attorney ("AUSA") Puneet Kakkar, has violated Mr. Herrera's fundamental rights to due process and a fair trial by knowingly and intentionally presenting false testimony to the jury. This flagrant misconduct cannot be remedied by anything short of dismissal of all charges with prejudice. The government's false evidence infects not only Count Nine—the count to which it directly pertains—but the entire trial. Indeed, Mr. Herrera submits that the government's purpose in eliciting the false testimony was to not only bolster its weak claim as to Count Nine, but to raise doubts in the minds of the jurors about the veracity of Mr. Herrera and the defense case in general. This gross misconduct alone supports the dismissal of the Indictment. Unfortunately, this has not been the only serious wrongdoing by the government, and considering all of the misconduct that has permeated this case from the outset, dismissal is compelled.

Mr. Herrera stands accused in Count Nine of making a false statement in a passport application. In its attempt to prove that charge, the government has itself resorted to making false statements to the Court and jury. The government desperately wants the jury to believe that Mr. Herrera lied because it knows that would likely influence the jury's decision on the remaining fraud charges. The issue in Count Nine is simple—Did Mr. Herrera meet Mr. Whittington in 2003 or not? The government's theory—at least according to the opening statement—is that Mr. Herrera met Mr. Whittington in 2006 while Mr. Whittington was incarcerated in the Taft Correctional Institution, a federal facility. Mr. Herrera disputes this claim. As set forth in the passport application, Mr. Herrera met Mr. Whittington in 2003 while Mr. Whittington was incarcerated in state custody in Indio, California, only a few miles from Mr. Herrera's office. In support of this, Mr. Herrera has introduced evidence showing Mr. Whittington was in the Riverside County Jail in Indio while facing state charges from June 27, 2003 through early

2005.  In an attempt to discredit the defense evidence, AUSA Kakkar knowingly elicited false testimony from Veronica Eberhardt that from June 25, 2003 to February 15, 2005 Mr. Whittington was incarcerated in the federal facility in Sheridan, Oregon.  AUSA Kakkar knew before asking these questions that Bureau of Prisons ("BOP") records showed that Mr. Whittington was in state custody pursuant to the Interstate Agreement on Detainers during that period.  He nevertheless attempted to mislead the jury by lying about Mr. Whittington's whereabouts.  Such flagrant misconduct has deprived Mr. Herrera of any hope of a fair trial and cannot be tolerated.

## II.    BACKGROUND FACTS

On March 14, 2016, in response to a subpoena requesting information about Jerome Whittington's incarceration between January 1, 2003 and December 31, 2003, BOP Supervising Attorney Eliezer Ben-Shmuel wrote a letter to Special Agent ("SA") Catherine Otis and explained:

> Note that Mr. Whittington was housed at the Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan") from January 15, 2002 through June 25, 2003.  On June 25, 2003, he was removed from BOP custody pursuant to the Interstate Agreement on Detainers to resolve a detainer issued in another jurisdiction. . . .  He did not return to BOP custody until February 15, 2005, when he was admitted to the Taft Correctional Institution.

(Exhibit ("Ex.") 1.)[1]  A copy of this letter was subsequently produced to the defense in discovery by AUSAs Puneet Kakkar and Jerry Yang.  It is attached hereto as Exhibit 1.

---

[1] According to the United States Attorneys' Manual ("USAM"), the Interstate Agreement on Detainers is a statute enacted in 1970 that "applies to transfers of sentenced prisoners for unrelated trials between two States, and to transfers from the Federal Government to the States, and from the States to the Federal Government."  USAM, Criminal Resource Manual § 534.

1    On June 1, 2016, AUSA Kakkar, AUSA Yang, and SA Otis interviewed Mr. Ben-Shmuel.  The FBI 302 report of interview and handwritten notes were subsequently produced in discovery by AUSAs Kakkar and Yang.  They are attached hereto as Exhibit 2.  During that interview, they discussed Mr. Whittington's incarceration after February 15, 2005.  (Ex. 2.)  Mr. Ben-Shmuel stated he would identify a witness to testify about the SENTRY records.  Veronica Eberhardt, a BOP Supervisory Correctional Systems Specialist, was that witness.

On June 15, 2016, AUSA Kakkar and two FBI agents interviewed Veronica Eberhardt in person at the Metropolitan Detention Center in Los Angeles.  (Ex. 5 at 51:17-52:5; Ex. 3.)  The FBI 302 report of interview and the handwritten notes were subsequently produced in discovery by AUSAs Kakkar and Yang.  They are attached hereto as Exhibit 3.  Ms. Eberhardt told AUSA Kakkar that, according to the SENTRY report for Mr. Whittington, from June 25, 2003 to February 15, 2005, Mr. Whittington was on Interstate Agreement on Detainers status, which Ms. Eberhardt indicated "likely means state custody."  (Ex. 3.)  She explained neither the SENTRY report nor the USM 129 indicates Mr. Whittington's exact location in state custody.  (Ex. 3.)  The handwritten notes from that interview state, "6/25/03-2005-interstate-state custody."  (Ex. 3.)

On August 5, 2016, counsel for Mr. Herrera produced discovery to the government consisting of copies of documents that the defense may use in its case-in-chief at trial.  One of the documents was a copy of a certified case report from the Riverside County Superior Court for the matter *People v. Jerry Whittington*, case number INF043619.  This document has been marked and admitted at trial through SA Mark Hunter as Exhibit 467.  A copy is attached hereto as Exhibit 4.  The case report shows that Mr. Whittington was arraigned in Riverside County Superior Court on June 27, 2003, and that he was to be housed "at Indio Jail only."  (Ex. 4.)  Mr. Whittington pled guilty and was sentenced on January 18, 2005, and it was thereafter, as everybody recognizes, that he was housed in federal custody at

1 | Taft. (Exs. 1, 4.)

## III. THE GOVERNMENT'S MISCONDUCT

During jury trial on August 18, 2016, the government called Veronica Eberhardt as a witness. Excerpts of the Reporter's Transcript of August 18, 2016 are attached hereto as Exhibit 5. Ms. Eberhardt was examined by AUSA Kakkar, who was present for the June 15, 2016 interview of Ms. Eberhardt. During the examination, the following exchange occurred:

> Q [by AUSA Kakkar]. That would be the third line from the top, that [Mr. Whittington] was in Sheridan from June 25th, 2003, to February 16th, 2005?
> 
> A. Correct.
> 
> Q. That's he was in Sheridan?
> 
> A. Yes.

(Ex. 5 at 47:22-48:1.)

AUSA Kakkar then asked:

> Q. So -- sorry. If I could direct your attention to the fourth line where it says, SHE A-DES designated at assigned facility from 1-19-2002 to June 25th, 2003. What does that line mean?
> 
> A. It means that that is -- he was keyed in back into the facility on that date.
> 
> Q. At Sheridan?
> 
> A. Yes, at Sheridan.

(Ex. 5 at 48:5-12.) The conclusion of the examination included the following exchange:

> Q. In -- and in 2003 you had mentioned that he was in two different places. Which federal facility was he at in 2003?
> 
> A. In 2003 he was in Sheridan.
> 
> Q. And that was from June 25th onward?

- 4 -

1           A.  2003, June 25th, yes.

2 (Ex. 5 at 50:20-24.)

3      On August 19, 2016, the government called SA Mark Hunter.  Excerpts of the Reporter's Transcript of August 19, 2016 are attached hereto as Exhibit 6.  During his examination, AUSA Kakkar introduced Exhibit 31—the judgment from Mr. Whittington's federal conviction for wire fraud in 2000.  AUSA Kakkar specifically asked SA Hunter what sentence Mr. Whittington received and SA Hunter responded, "120 months."  (Ex. 6 at 36:18-21.) [2]

## IV. ARGUMENT

The government knowingly presented false testimony to the jury in an attempt to bolster its claim that Mr. Herrera lied when he signed the passport affidavit indicating he met Mr. Whittington in 2003, the charge in Count Nine.  Of course, this claim impacts much more than the charge in Count Nine—it impacts the entire Indictment.  If the jury believes the government's claim that he lied in support of Mr. Whittington's passport, then it is much more likely that the jury will find that Mr. Herrera intended to defraud Mr. Vienna and Mr. Scislowski, Mr. Whittington's fraud victims, who constitute the basis for all the other remaining counts in the Indictment.  In fact, the defense submits that is the only reason Count Nine was even charged.  The government's own witness on Count Nine, Passport Specialist Denise Denis, has testified that an identifying witness, such as Mr. Herrera was for Mr. Whittington in the latter's passport application, must know the applicant for at least two years.  Even under the government's flawed theory, Mr. Herrera knew Mr. Whittington for at least three to four years.  The alleged false statement, therefore, had absolutely no bearing on the passport application.  The

---

[2] The government did not introduce any of Mr. Whittington's numerous other convictions that were also located within his BOP file; the only point they sought to introduce was that Mr. Whittington was sentenced in 2000 to ten years in *federal* custody.

1  only purpose, then, for indicting Mr. Herrera at all for that offense was to call Mr.
2  Herrera a liar, as the government did in its opening statement.
3       Ironically—and tragically—in its zeal to convict Mr. Herrera and to win this
4  trial, the government has resorted to lying—suborning perjury—in its attempt to
5  prove that Mr. Herrera made a false statement. It is, of course, well-established by
6  the United States Supreme Court that obtaining a conviction by the use of false
7  testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).
8  Similarly, due process is violated when the government, although not soliciting
9  false evidence, fails to correct it when it appears. *Id*.
10       Here, the government solicited the false evidence through its own leading
11  questions. AUSA Kakkar was personally present for the interviews of both Mr.
12  Ben-Shmuel and Ms. Eberhardt. As co-counsel in this prosecution, he would have
13  reviewed the discovery, including the letter from BOP Supervising Attorney Ben-
14  Shmuel. He knew that the BOP records showed Mr. Whittington was in state
15  custody pursuant to the IAD from June 25, 2003 to February 15, 2005. He received
16  the defense discovery that included the certified Riverside County case report that
17  shows that Mr. Whittington was arraigned in Riverside County Superior Court on
18  June 27, 2003, and that he was to be housed "at Indio Jail only." Yet, in his
19  examination of Ms. Eberhardt at trial, he asked the leading question, "[Mr.
20  Whittington] was in Sheridan from June 25th, 2003, to February 16th, 2005?" He
21  *knew* that was false. Despite her earlier interview statements, and despite the
22  information actually contained in the SENTRY records, Ms. Eberhardt responded,
23  "Correct." To clarify that both knew exactly what they were saying, AUSA Kakkar
24  continued with the following leading question, "That's he was in Sheridan?" and
25  Ms. Eberhardt replied, "Yes." Shockingly, they continued the lie when AUSA
26  Kakkar further asked what one of the lines on the SENTRY dated June 25, 2003
27  means, and Ms. Eberhardt responded that it means Mr. Whittington was keyed back
28  into Sheridan on that date. To make absolutely certain the jury heard and

1  understood the false testimony, AUSA Kakkar went back to the well yet again at
2  the end of his examination:

3       Q. In -- and in 2003 you had mentioned that he was in two
4     different places. Which federal facility was he at in 2003?
5       A. In 2003 he was in Sheridan.
6       Q. And that was from June 25th onward?
7       A. 2003, June 25th, yes.

8  (Ex. 5 at 50:20-24.)

9     On cross examination, Ms. Eberhardt initially confirmed that she had
10 testified on direct examination that Mr. Whittington was in Sheridan from June 25,
11 2003 to February 16, 2005. (Ex. 5 at 53:16-21.) After defense counsel pressed the
12 issue, she conceded that, according to the SENTRY report, Mr. Whittington was
13 not in Sheridan during that period and that her direct testimony—solicited by
14 AUSA Kakkar's leading questions—was "not accurate." (Ex. 5 at 54:22-55:4.)

15     Even after being caught in his lie and having an entire night to ponder this,
16 not only did AUSA Kakkar not make any attempt to come clean and correct the
17 matter, he managed to compound the error further through his examination of SA
18 Hunter, the FBI agent called the next day in lieu of the case agent, SA Otis, to
19 introduce bank records, phone records, and BOP records. Through SA Hunter,
20 AUSA Kakkar introduced the fact that, in 2000, Mr. Whittington received a 120-
21 month *federal* sentence (that is, a ten-year sentence). The defense submits that the
22 only purpose for that testimony, and for the introduction of Exhibit 31 which
23 substantiates the length of that sentence, was to cause the jury to mistakenly believe
24 that Mr. Whittington was physically in federal custody during the 2003 through
25 2005 period, and not in the Indio jail just a few miles from Mr. Herrera's office as
26 the defense posited in its opening statement (and demonstrated through the
27 introduction of Exhibit 467).

28     The government's misconduct was clearly flagrant and intentional, and it has

violated Mr. Herrera's due process right to a fair trial. The only appropriate remedy is an immediate dismissal of the entire case with prejudice.

This Court "may exercise its supervisory power to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (internal quotations omitted). The remedy of dismissal of an indictment with prejudice is appropriate only in cases of "flagrant prosecutorial misconduct." *Id.* "[A]ccidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior." *Id.* A reckless disregard for the prosecution's constitutional obligations may, however, rise to the level of "flagrant" misconduct. *Id.*

Purposefully misrepresenting facts to the jury is among the most severe forms of government misconduct. It is hard to imagine anything more serious, as it is tantamount to manufacturing false evidence. The AUSAs stand before the jury countless times during trial and announce that they are Assistant United States Attorneys and that they are prosecuting this case "for the United States." Those words alone cloak the AUSAs and their witnesses with dignity, respect, and power. As the Ninth Circuit has explained, "Evidence matters; closing argument matters; statements from the prosecutor matter a great deal." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). In the words of our Supreme Court, an Assistant United States Attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Kojayan*, 8 F.3d at 1323 ("[L]awyers representing the government in criminal cases serve truth and justice first."). That bears repeating—the interest of the prosecutor is not to win the case,

but to see that justice is done. That principle appears lost on AUSA Kakkar, and has been lost by the prosecution team in this trial.

In light of their status and stature as representatives of the government, prosecutors have an "obligation . . . to avoid making statements of fact to the jury not supported by proper evidence introduced during trial." *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969). The prosecutor's job is not "just to win, but to win fairly, staying well within the rules." *Kojayan*, 8 F.3d at 1323.

Here, the government has crossed well over the line defining fair, permissible conduct. Even worse, AUSA Kakkar knew exactly what he was doing. The government learned on August 5, 2016 that Mr. Herrera intended to introduce records from Riverside County Superior Court showing that from June 27, 2003 through at least January 18, 2005 Mr. Whittington was housed in Riverside County Jail at Indio—only a few miles from Mr. Herrera's La Quinta office. This is not the only evidence that the government was aware of that is consistent with the defense's position that Mr. Herrera met Mr. Whittington during that time. SA Hunter explained on cross examination that he interviewed John Hemmer—Mr. Whittington's criminal defense attorney in the Riverside County Superior Court matter—to establish a "timeline" regarding when Mr. Herrera met Mr. Whittington. (Ex. 6 at 84:22-24.) SA Hunter testified that he had learned from SA Otis that Mr. Hemmer "could possibly have been the person who introduced the two of them, introduced David Herrera [to Mr. Whittington]."[3] (Ex. 6 at 85:17-19.) In order to undermine the credibility of the defense's evidence, AUSA Kakkar knowingly elicited false testimony from Ms. Eberhardt that Mr. Whittington was incarcerated in FCI Sheridan (which is located in Oregon) during that period. The government

---

[3] When and how Mr. Herrera and Mr. Whittington actually met is irrelevant to this motion; the government cannot fabricate evidence and knowingly elicit false testimony even in the pursuit of what they believe to be true. The ends do not justify illegal means.

- 9 -

is not searching for truth—it is intentionally distorting truth in order to win this trial.

If there is any doubt that dismissal is the only appropriate remedy for this flagrant conduct, an examination of other government "missteps" during this case eliminates any doubt. To begin, Mr. Herrera submits that the government engaged in similar misconduct before the indicting Grand Jury. In securing the original indictment, the government presented no evidence to support the substantive wire fraud counts. None.[4] Mr. Herrera moved to dismiss those counts prior to trial. (Dkt. #73.) In response, the government secured a superseding indictment purportedly to change Mr. Whittington from a defendant to a co-conspirator—a change, as this Court knows, routinely accomplished by stipulated amendment. In reality, the government seized the opportunity to correct its defective indictment by presenting some evidence, in the form of summary hearsay testimony by SA Otis, to support the wire fraud counts. However, the misconduct persisted—this time in the form of the presentment of false and misleading evidence to the grand jury.[5]

---

[4] During the government's presentation to the Grand Jury, the following testimony was offered in support of the wire fraud counts:

> Q [By AUSA Yang] The wire communications that are alleged on Page 7 in Count Two – do you have the back-up documentation for that particular wire communication?
> A [By SA Otis] Yes.
> Q [By AUSA Yang] Turning to Counts Four through Eight, the counts that are described, the uses of the wires that are described on Page 12 of that count, do you have all of the back-up documentation for all of those counts?
> A [By SA Otis] Yes.

(*See* Motion to Dismiss Counts Two and Four through Eight, Dkt. #73, at 2:4-15.)

[5] Rather than raise this new misconduct prior to trial—and give the government the opportunity to seek a Third Superseding Indictment to fix these problems—the defense elected to confront the government's charges as alleged head-on at trial.

1    Most notably, in support of Count Two, SA Otis testified that the telephone
2  records show that on June 5, 2010, within the Central District of California, Mr.
3  Herrera and Mr. Whittington made and caused to be made an international
4  telephone call in support of the scheme to defraud charged in Count Two. (Trial
5  Ex. 306 at 4:18-5:23.) But the telephone records actually show that the charged call
6  was placed from Encinitas, California, located in San Diego County in the Southern
7  District of California, to Spain. The call did not, as the prosecution represented to
8  the Grand Jury and caused them to find in their Indictment, occur within the Central
9  District of California. Similarly, SA Otis testified that the charge in Count Eight
10 was supported by the bank records. Namely, that on January 14, 2011, within the
11 Central District of California, Mr. Herrera and Mr. Whittington conducted or
12 caused to be conducted a debit card transaction from Mr. Whittington's bank
13 account. (*Id*. at 6:16-7:16.) But the bank records actually show that the charged
14 debit transaction occurred in Carlsbad, also in the Southern District of California.
15 Thus, the telephone and bank records did not support the charges as the prosecutors
16 and SA Otis alleged, and the charges should never have been filed because venue
17 was not appropriate in the Central District of California. Although the government
18 apparently recognized its error and dismissed Counts Two and Eight on the
19 morning of trial, Mr. Herrera's counsel spent substantial time and resources
20 conducting research and preparing to defend against those improper charges.
21    Other examples of government misconduct were revealed during testimony
22 by SA Hunter on Friday. SA Otis summarily testified before the Grand Jury, again
23 in response to the prosecution's questioning, that the charges in Counts Four
24 through Eight were all "supported by the evidence." (Trial Ex. 306 at 6:8-19.)
25 However, as SA Hunter testified on Friday, there is no evidence as to what was
26 purchased in each of the charged debit transactions or for what purpose the money
27 from the charged ATM transaction was used. Thus, he does not know what, if
28 anything, the charged transactions had to do with the alleged scheme to defraud.

(Ex. 6 at 52:8-20.) Absent any evidence of what was purchased, who made the purchase, and how the purchase was linked to the scheme to defraud, it was grossly misleading to summarily advise the Grand Jury that the wire fraud allegations were all "supported by the evidence." The government also misled the Grand Jury and the trial jury regarding the date on which the wire transaction charged in Count Seven occurred. Both juries were advised—falsely—that the bank records showed the debit transaction occurred on January 7, 2011. (*See* Ex. 6 at 16:13-20.) Under cross-examination, SA Hunter clarified that the transaction actually occurred on January 5, 2011 at Disneyland Resort in Anaheim. That was the same date on which the alleged scheme to defraud was carried out at Eva Reber's home in Camarillo—more than 80 miles from Disneyland—and two days *before* the proceeds of the fraud were transferred from the Scislowskis to Mr. Whittington's bank account on January 7, 2011. Again, it was grossly misleading to simply advise the Grand Jury that the wire fraud transaction as described in the Indictment was "supported by the evidence."

The government's abusive discovery practices leading up to trial have been well documented in other motions and court hearings. (*See, e.g.,* Motion to Dismiss the Indictment Based on Speedy Trial Act Violations, Dkt. #53.) In fact, the Court expressly found that a continuance of trial from the June date was required due to the government's late production of *Brady* material. (*See* Dkt. #171 at 7 (explaining that "the government improperly withheld impeachment evidence from the defense until the eve of trial").)

Finally, the Court had to caution the government at side bar on Friday during SA Hunter's testimony regarding the government's misleading question in redirect examination about whether SA Hunter knew if any of his former FBI colleagues who retired use their badge to get business. (Ex. 6 at 111:23-112:23.) This questioning was clearly designed to contradict testimony elicited in cross-examination from SA Hunter that the many retired special agents who become

private investigators use their credentials and former employment as special agents in marketing, and that there is nothing wrong with that. (Ex. 6 at 62:25-63:10.) The Court is certainly familiar at this point with the centrality to the prosecution's theory of the case of the defendant displaying his retired DEA badge at the dinner with Ms. Tyson, at the alleged meeting with Mr. Vienna, and at the dinner party with the Scislowskis.

Notwithstanding the fact that it is well known in federal law enforcement circles that a retired FBI agent, unlike a retired DEA agent and other retired federal agents, does not get to keep a retired version of their badge (so of course they could not use it), AUSA Kakkar asked SA Hunter whether he knew if any of his former FBI colleagues who had become private investigators used *their* badge to get business. (Ex. 6 at 110:13-15.) The defense objected and then the following exchange occurred:

> Q. [By AUSA Kakkar] Agent Hunter, do you know if any of your colleagues that became private investigators used their badge to get business?
>
> A. My answer would be no. And let me explain a little bit. In the FBI, when you retire, you will be issued retirement credentials, but you're not issued a retirement badge.

(Ex. 6 at 110:23-111:2.) Clearly, the initial answer—"no"—is what AUSA Kakkar was after. To his credit, SA Hunter recognized that answer would have been misleading and immediately stated that it needed clarification. The answer AUSA Kakkar sought would have been misleading because it could have led the jury to infer that Mr. Herrera was culpable for merely displaying his badge to other people. SA Hunter's response is an example of the level of integrity that is to be expected, in fact to be demanded, of federal prosecutors and federal agents prosecuting a criminal defendant under our Constitution. In contrast, AUSA Kakkar's question, designed to elicit a misleading answer, is to the contrary.

In light of the misconduct that has infected these proceedings since the initial presentment to the grand jury, and the flagrant misbehavior of AUSA Kakkar during testimony before the jury, dismissal with prejudice is the only just remedy. There is no way that Mr. Herrera can obtain a fair trial at this point. The evidence supporting the government's charges is weak at best, which amplifies the prejudice that flows from the misconduct. *See United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (As "the case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly.") A mistrial simply gives the government a "do-over," which given the tortured and lengthy history of this case pre-trial is simply unfair. Not only has Mr. Herrera been forced to prepare to defend against charges that should never have been filed, but Mr. Herrera now faces a jury that has been irrevocably tainted by false evidence. Moreover, AUSA Kakkar's conduct demonstrates that he just does not get it. AUSA Kakkar appears to lack any appreciation for his role as a government representative—he does not appear to understand what it means to stand up in court "for the United States." To remedy this serious and prejudicial misconduct, and to deter the government from future misconduct, dismissal is warranted and appropriate.[6]

---

[6] After learning that the defense requested transcripts for the Thursday and Friday sessions, AUSA Kakkar apparently realized that the defense was exploring this issue. On Sunday, August 21, 2016—three days after eliciting the false statements and two days after following up with SA Hunter to further support the false statement—AUSA Kakkar sent an email to the defense team that stated, in part:

> We just reviewed the Eberhardt testimony from trial and want to make sure that it is clear that the jury is aware that Mr. Whittington was not in federal custody from June 25, 2003 to February 16, 2005. We believe that Stephen clarified this point on cross-examination, but in light of the technical nature of the testimony, we would propose the following stipulation:
>
> "Mr. Whittington was in federal custody, at Sheridan, from on or about

## V. CONCLUSION

For the foregoing reasons, Mr. Herrera respectfully requests that the Court dismiss all remaining charges with prejudice and exonerate his bond.

Dated: August 21, 2016     **LARSON O'BRIEN LLP**

By: /s/ Stephen G. Larson
STEPHEN G. LARSON
JERRY A. BEHNKE
MELISSA A. MEISTER

Attorneys for Defendant
DAVID GARCIA HERRERA

---

January 15, 2002 to on or about June 25, 2003. Mr. Whittington was not in federal custody from on or about June 25, 2003 to on or about February 16, 2005. Mr. Whittington returned to federal custody, at Taft, on or about February 16, 2005."

Please let us know if this is agreeable, or if you have proposed modifications.

As Mr. Larson is informing the government in his response to Mr. Kakkar's proposed stipulation, which itself is an explicit recognition that he elicited false testimony from a witness before the trial jury, this falls far short of providing a remedy for the misconduct. The false testimony elicited from Ms. Eberhardt, followed by her admission on cross examination that her prior testimony was "not accurate," and followed by the testimony elicited from SA Hunter that Mr. Whittington was serving a 10-year *federal* sentence, has undoubtedly left the jury completely confused on this issue. The government's false testimony directly contradicted the defense opening statement on this point and undermined defense counsel and Mr. Herrera's credibility with the jury. The jury will have had five days to ponder the false testimony before they would even receive the government's proposed stipulation. It is too little too late. This damage cannot now be undone.