EILEEN M. DECKER
United States Attorney
JOSEPH B. WIDMAN
Assistant United States Attorney
Chief, Riverside Office
JERRY C. YANG (Cal. Bar No. 241323)
Assistant United States Attorney
Deputy Chief, Riverside Office
PUNEET V. KAKKAR (Cal. Bar No. 259816)
Assistant United States Attorney
      Riverside Office
      3403 10th Street, Suite 200
      Riverside, California 92501
      Telephone: (951) 276-6221/6228
      Facsimile: (951) 276-6202
      E-mail:    jerry.yang@usdoj.gov / puneet.kakkar@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 15-315(B)-JGB |
|---|---|
| Plaintiff, | OPPOSITION TO DEFENDANT'S MOTION TO DISMISS [176] |
| v. | Trial Date:   August 22, 2016 |
| DAVID GARCIA HERRERA, | Trial Time:   8:30 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Jesus G. Bernal |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Jerry C. Yang and

///

///

1   Puneet V. Kakkar, hereby files the government's opposition to

2   defendant's motion to dismiss.

3    Dated: August 22, 2016             Respectfully submitted,

4                                       EILEEN M. DECKER
                                        United States Attorney
5
                                        JOSEPH B. WIDMAN
6                                       Assistant United States Attorney
                                        Chief, Riverside Office
7

8                                       _____/s/_____
                                        JERRY C. YANG
9                                       PUNEET V. KAKKAR
                                        Assistant United States Attorneys
10
                                        Attorneys for Plaintiff
11                                      UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        2

# Table of Contents

I.    INTRODUCTION..................................................2

II.   FACTUAL BASIS................................................3

    A.    Testimony of Veronica Eberhardt...........................4

    B.    Testimony of SA Hunter....................................8

    C.    Proposed Stipulation......................................9

III.  ARGUMENT.....................................................9

    A.    The Government Did Not Engage in Misconduct...............9

    B.    Dismissal is Inappropriate...............................10

    C.    Defendant's Other Claims Do Not Warrant Relief...........11

IV.   CONCLUSION...................................................12

**Table of Authorities**

CASES

Napue v. Illinois,
     360 U.S. 264 (1959)........................................10

United States v. Houston,
     648 F.3d 806 (9th Cir. 2011)..............................10

United States v. Renzi,
     769 F.3d 731 (9th Cir. 2014)..............................10

United States v. Reyes,
     660 F.3d 454 (9th Cir. 2011)............................9, 10

United States v. Zuno-Arce,
     339 F.3d 886 (9th Cir. 2003)..............................10

### OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## I.   INTRODUCTION

Defendant seeks the dismissal of this case, mid trial, on the incorrect theory that false evidence has been presented to the jury and that the government has intended for false evidence to be elicited.  Defendant's request should be denied because there is no basis for such a remedy; the government has not intended to elicit false evidence and it does not appear that the jury received any.  To the extent defendant has raised any prejudice in this trial, the Court may remedy that prejudice through stipulation or other measure.

First, the record does not support the argument that the government has intentionally created false evidence, or that the government intentionally sought false evidence.  Defendant's primary accusation of the government's conduct centers on questions posed to Ms. Veronica Eberhardt, a witness from the Bureau of Prisons ("BOP"), regarding the custodial history of Mr. Whittington.  A review of the entire testimony, which defendant has not provided to the Court, reflects that the government did not intentionally elicit false evidence, but rather, initially elicited, through testimony and Ms. Eberhardt's description of the exhibit she was interpreting, the correct evidence (that Mr. Whittington was in state custody from 2003 to 2005) and attempted to correct the witness where confusion arose. Further evidencing the lack of the government's intent to elicit false evidence is that the government had disclosed to defendant information regarding Mr. Whittington's custodial history received from the BOP, such that defendant would be able to impeach Ms. Eberhardt should her testimony differ.  And that is what happened;

1    ultimately, defendant resolved any confusion on cross-examination,

2    which obviated any further need to correct the record.

3         Then, defendant claims the government elicited false testimony

4    by having SA Hunter read the sentence imposed on Mr. Whittington in a

5    2000 conviction (in addition to other items on the document), the

6    admission of which defendant did not object.  SA Hunter also

7    testified that inmates are often released before the time imposed of

8    a sentence.  Defendant himself requested SA Hunter to read another

9    BOP document reflecting that Mr. Whittington was serving a 120-month

10   sentence while at Taft (where he arrived in February 2005).  This

11   testimony, coupled with the evidence already in the record that Mr.

12   Whittington had been in and out of federal and state custody in the

13   2000s, made the record clear that Mr. Whittington did not actually

14   remain in federal custody for ten years.  Thus, there was no false

15   testimony provided to the jury by having SA Hunter read the 120-month

16   sentence imposed on Mr. Whittington in 2000, and by implication, the

17   government did not intend to provide false testimony.

18        Ultimately, there has been no false evidence solicited or

19   provided to the jury.  If anything, defendant was able to correct any

20   glaring error and retained the benefit of both impeaching the

21   government witness (Ms. Eberhardt) and ensuring that the record was

22   correct.  In any event, as trial is not over, the Court is in a

23   position to remedy any prejudice (to the extent it exists) by way of

24   stipulation to the jury, which is what the government proposed to

25   defendant prior to his filing this motion.

26   II.  **FACTUAL BASIS**

27        Mr. Whittington was convicted for federal fraud in 2000 for a

28   sentence of 120 months.  From 2000 onward, Mr. Whittington alternated

between federal and state custody.  The government does not dispute, and has never intended to dispute, that according to records of the Bureau of Prisons ("BOP"), Mr. Whittington was in state custody from June 25, 2003 to February 15, 2005.  Further, the government affirmatively elicited evidence that Mr. Whittington was in state custody for several periods of time after this conviction (e.g., the testimony of Jennifer Paul), which communicated to the jury that a 120-month sentence did not necessarily mean that Mr. Whittington was in federal custody for this sentence.

A.   **Testimony of Veronica Eberhardt**

A review of the complete testimony of Ms. Eberhardt reflects that the government intended to elicit truthful testimony, namely, that Mr. Whittington was in state custody from June 23, 2003 to February 15, 2005.  Ms. Eberhardt initially provided testimony and interpretation of the accompanying exhibit to that effect, and the government's attempt to confirm the prior place of federal confinement resulted in confusion.  The government was partially successful in clarifying the record; ultimately, in any event, defense counsel adequately ensured the record was correct and clear on cross-examination.

Ms. Eberhardt initially provided general testimony about the SENTRY records, including explaining that the left-most column denotes the facility where the inmate is housed, the description refers to how the inmate was admitted, and the start/stop date. (Exh. A, 139:15-140:11.)  The SENTRY record was received into evidence as Government's Exhibit 20.

1      Ms. Eberhardt first testified that according to the SENTRY

2   record, Mr. Whittington was at Taft Correctional Facility from

3   February 15, 2005 to December 1, 2006. (Exh. A, 140:18-21.)

4      Then, the government asked Ms. Eberhardt to review the first

5   page of the document and identify where he was prior to Taft.  Ms.

6   Eberhardt testified that prior to Taft, based on the bottom of the

7   first page of the exhibit, Mr. Whittington was in a "transit

8   facility," that is not in BOP (federal) custody.  The document she

9   was reviewing while providing this testimony, which was published

10  before the jury, reflected that Mr. Whittington was at the transit

11  facility between October 23, 2003 to February 15, 2005.  (Exh. A,

12  141:2-8.)

```
            DESIGNATED, AT ASSIGNED FACIL   02-15-2005 0815 12-01-2006 0443
P03   RELEASE 02 RELEASED FROM IN-TRANSIT, FEB   02-15-2005 1115 02-15-2005 1115
P03   A-ADMIT 10 ADMITTED TO IN-TRANSIT, OCT     10-23-2003 0530 02-15-2005 1115
```

15      Ms. Eberhardt then elaborated that the second page of the

16  exhibit also reflected Mr. Whittington's custody in a transit

17  facility.  Ms. Eberhardt clarified that where the facility was

18  indicated by numbers, that was a non-BOP facility.  She testified

19  that "4-T" was one such example.  The document that was published to

20  the jury reflected Mr. Whittington's custody in the "transit"

21  facility from June 23, 2003 to October 23, 2003.

```
4-T   RELEASE    RELEASED FROM IN-TRANSIT FACL 10-23-2003 0530 10-23-2003 0530
4-T   A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-25-2003 1825 10-23-2003 0530
```

24      The government asked Ms. Eberhardt at which federal facility Mr.

25  Whittington was confined prior to Taft.  Ms. Eberhardt answered

26  Sheridan.

27  ///

28  ///

1    The government then asked whether this referred to the third

2  line of the SENTRY record, from June 25, 2003 to February 16, 2005:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4-T | RELEASE | RELEASED FROM IN-TRANSIT FACL | 10-23-2003 | 0530 | 10-23-2003 | 0530 |
| 4-T | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 06-25-2003 | 1825 | 10-23-2003 | 0530 |
| SHE | IAD | INTERSTATE AGRMNT ON DETAINERS | 06-25-2003 | 1525 | 02-16-2005 | 0826 |
| SHE | A-DES | DESIGNATED, AT ASSIGNED FACIL | 12-19-2002 | 1527 | 06-25-2003 | 1525 |
| SHE | ESCORT TRP | ESC TRIP OTHER THAN LOCAL HOSP | 12-19-2002 | 0936 | 12-19-2002 | 1527 |
| SHE | A-DES | DESIGNATED, AT ASSIGNED FACIL | 12-18-2002 | 1451 | 12-19-2002 | 0936 |
| SHE | ESCORT TRP | ESC TRIP OTHER THAN LOCAL HOSP | 12-18-2002 | 0914 | 12-18-2002 | 1451 |
| SHE | A-DES | DESIGNATED, AT ASSIGNED FACIL | 01-15-2002 | 1820 | 12-18-2002 | 0914 |

8    Ms. Eberhardt answered in the affirmative.  Ms. Eberhardt's

9  response was contrary to what she had stated in a prior interview and

10 what other BOP officials had informed the government (all of which

11 were disclosed to the defendant well in advance of trial); her answer

12 should have been that the third line indicated that Mr. Whittington

13 was released on an interstate agreement.  After briefly discussing

14 the facility prior to Sheridan, the government then directed Ms.

15 Eberhardt to the fourth line, which was also an incorrect line with

16 respect to Mr. Whittington's entire confinement at Sheridan.  Ms.

17 Eberhardt testified that the fourth line meant that Mr. Whittington

18 was "keyed in back into the facility on that date"; the line included

19 a date range of December 19, 2002 to June 25, 2003.  (Exh. A, 142:5-

20 12.) ("So – sorry.  If I could direct your attention to the fourth

21 line . . .").  This second response (which was also incorrect in that

22 it was incomplete) made the earlier, incorrect testimony all the more

23 confusing.  But what is clear from the transcript, including the

24 prosecutor's apology, is that there was some confusion as to the

25 dates, as opposed to any intent to mislead.

26    Thus, toward the end of the testimony, the government attempted

27 to clarify Mr. Whittington's place of confinement in 2003, noting

28 that both the exhibit and her testimony indicated that Mr.

6

Whittington was in two facilities.  At this point, confusion between the prosecutor and the witness resulted in a partial clarification for the second page of the exhibit, that Mr. Whittington was <u>not</u> in federal custody from June 25, 2003 to October 2003:

> Q. In -- and in 2003 you had mentioned that he was in two
> different places. Which federal facility was he at in 2003?
>
> A. In 2003 he was in Sheridan.
>
> Q. And that was from June 25th onward?
>
> A. 2003, June 25th, yes.
>
> Q. I'm sorry. So -- I'm sorry. Could you actually explain
> in 2003, based on your records, where was he confined?
>
> A. In Sheridan.
>
> Q. In Sheridan?
>
> A. Yes.
>
> Q. And so the line that says 4-T admitted June 25th, 2003,
> to October 2003, you had mentioned this is local custody?
>
> A. He was released from Bureau of Prisons custody. He was
> still in custody, just we don't know where.

(Exh. A, 144:20-145:8.)

Ideally, at this juncture, the government could have directed the witness back to the first page, where her testimony and review of the exhibit reflected that Mr. Whittington was not in BOP custody from October 2003 to February 2005.

During cross-examination, defense counsel addressed the confusion, if there was any, by having Ms. Eberhardt clarify that Mr. Whittington was in state custody from June 24, 2003 to February 15, 2005 and was not at Sheridan during this time.  (Exh. A, 147:16-149:3.)  Had defense counsel not made this correction, the government would have clarified the record on re-direct.

**B.   Testimony of SA Hunter**

Defendant also claims that the government committed prosecutorial misconduct by eliciting SA Hunter to read the reference to a 120-month sentence imposed in Mr. Whittington's 2000 conviction, which somehow implied that Mr. Whittington actually served ten years in federal prison.  The purpose of eliciting this testimony was to address, pre-emptively, Mr. Whittington's significant sentence (which defendant has used to discredit the government's case) and also present facts from which a jury could infer defendant knew that Mr. Whittington was committing further schemes to defraud.  There was nothing prejudicial about this evidence in light of the record, and indeed, defendant did the same.

When examining SA Hunter, the government moved to admit (among others) two exhibits from Mr. Whittington's BOP file.  The government moved to admit exhibit 16, a copy of a "Request for Transfer," dated April 11, 2005.  Defendant did not object to the admission of exhibit 16.  (Exh. B, 32:18-21.)  The government asked SA Hunter to read the first-half of the first sentence of the narrative, which was "Inmate Whittington arrived at Taft Correctional Institution on February 15, 2005[.]."  (Exh. B, 33:6-7).

Then, the government moved to admit exhibit 31, a copy of Mr. Whittington's 2000 conviction.  The relevance of this particular conviction (among other reasons), as opposed to Mr. Whittington's other convictions, is that defendant admitted that he met Mr. Whittington while he was serving time in federal prison.  Defendant did not object to the admission of exhibit 31.  (Exh. B, 32:18-21.) The government asked SA Hunter to read to the jury the date, the offense, the Court's justification for an upward departure, and the

1   sentence imposed, which was 120 months.  Defendant did not object to
2   any of these questions.  The government then asked SA Hunter whether,
3   in his experience, inmates are released prior to 120 months.  SA
4   Hunter responded in the affirmative.
5       On cross-examination as to this document, defendant requested SA
6   Hunter to read the remainder of the sentence, which was "he is
7   currently serving 120-month sentence for wire fraud."  (Exh. B, 71:6-
8   7.)
9       **C.   Proposed Stipulation**
10      On Friday, August 19, 2016, the government requested transcripts
11  of all days.  In reviewing the transcripts, the government recognized
12  potential confusion from the direct examination of Ms. Eberhardt's
13  testimony, and in this respect, on Sunday, August 21, 2016, offered
14  to defendant the opportunity to stipulate as to some of Mr.
15  Whittington's custodial history.  Defendant declined the request and
16  instead filed this motion.
17  **III. ARGUMENT**
18      **A.   The Government Did Not Engage in Misconduct**
19      The record does not reflect that the government intentionally
20  created, or elicited, false testimony.  The purported conduct here
21  involves the government's questions, which, as the Court instructs,
22  are not evidence.  With respect to the testimony of Ms. Eberhardt,
23  Ms. Eberhardt testified truthfully and then appeared to be confused.
24  The government attempted to correct this testimony, but was unable to
25  fully correct it.  This reflects a lack of intent to elicit false
26  testimony.  The government's lack of intent in eliciting this
27  confusion is further apparent in that the correct narrative had been
28  disclosed to defendant months before trial.  Thus, it would seem

1    illogical to elicit false testimony on an issue that could be easily
2    cross-examined, to the detriment of the government's case.   And that
3    is what happened; defendant corrected the record and benefited from
4    the impeachment of the government witness and counsel.

5        With respect to the testimony of SA Hunter, the government
6    simply elicited SA Hunter to review a conviction record (to which
7    defendant did not object) to provide the jury with an understanding
8    of the document.   The government in fact qualified the evidence,
9    asking SA Hunter to essentially inform the jury that sentences
10   imposed are not actually sentences served.   See <u>United States v.</u>
11   <u>Reyes</u>, 660 F.3d 454, 464–65 (9th Cir. 2011) (holding no misconduct
12   where government solicited testimony that was literally true and used
13   for a proper purpose where defendant argued it furthered a separate
14   "false impression").

15       **B.   Dismissal is Inappropriate**

16       Defendant seeks dismissal for the government's alleged
17   elicitation of false testimony, but provides no authority warranting
18   such a remedy at this posture -- in the midst of trial.   After a
19   conviction, a defendant seeking a new trial based on introduction of
20   false evidence or testimony at trial must show that "(1) the
21   testimony was actually false, (2) the prosecutor knew it was false,
22   and (3) the false testimony was material (<u>i.e.</u>, there is a reasonable
23   likelihood that the false testimony could have affected the
24   judgment)."   <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir.
25   2003); <u>see also</u> <u>Napue v. Illinois</u>, 360 U.S. 264, 269–271 (1959).
26   Defendant cannot meet his burden of establishing a <u>Napue</u> claim even
27   at this juncture.

28

                                    10

1    Central to a <u>Napue</u> claim is a showing of materiality.  And
2    defendant cannot make that showing because no judgment has been
3    rendered, nor has the government rested.  Defendant's claim that his
4    due process right to a fair trial has been compromised is not based
5    on any facts.  Indeed, as explained above, defendant has benefited
6    from the confusion in Ms. Eberhardt's testimony and his ability to
7    correct it.  Thus, at this point, there is no prejudice.  <u>See</u> <u>United</u>
8    <u>States v. Houston</u>, 648 F.3d 806, 814 (9th Cir. 2011) (testimony was
9    immaterial where defense counsel was able to effectively attack
10   witness's credibility); <u>United States v. Renzi</u>, 769 F.3d 731, 752
11   (9th Cir. 2014) (same).  To the extent there is any potential damage
12   to defendant's right to a fair trial, the Court is vested with
13   multiple remedies, such as a stipulation.  With a stipulation,
14   defendant would actually benefit from even more clear testimony from
15   the Court.  "Defense counsel's complete rejection of any limiting
16   instructions except its own does not, per se, make the Government
17   responsible for failing to correct misleading testimony."  <u>United</u>
18   <u>States v. Reyes</u>, 660 F.3d 454, 465 n. 2 (9th Cir. 2011).

19   **C.   Defendant's Other Claims Do Not Warrant Relief**
20        Defendant also attempts to boot-strap other issues that the
21   Court has either addressed, or are not properly before this Court:

22        • With respect to government's questioning SA Hunter about
23          the use of badges by retired FBI agents, the actual answer
24          (that FBI agents are not provided with badges upon
25          retirement), which is evidence, remedied any potential
26          misleading effect of the question.  Further, SA Hunter
27          testified in follow-up that he is aware that other
28          agencies conferred badges upon retirement.

11

- With respect to the government's discovery and
  presentation of evidence before the grand jury, defendant
  has not raised any cognizable reasons why those issues
  warrant dismissal in the midst of trial.  Defendant has
  already litigated some of these issues and may intend to
  do so in the future.  The Court should address those
  claims in their own regard.

**IV.   CONCLUSION**

For the reasons stated herein, the government requests the Court
to deny defendant's motion.

# Exhibit A

1          THE COURTROOM DEPUTY:  Thank you.  Please have a

2     seat.

3          If you can, please, state your full name and spell

4     your first and last name for the record.

5          THE WITNESS:  My name is Veronica Eberhardt.  My full

6     name?

7          THE COURTROOM DEPUTY:  Spell your full name.

8          THE WITNESS:  V-e-r-o-n-i-c-a, Eberhardt,

9     E-b-e-r-h-a-r-d-t.

10         THE COURT:  You may proceed.

11         MR. KAKKAR:  Your Honor, may I confer with defense

12    counsel briefly?

13         THE COURT:  Yes.

14         MR. KAKKAR:  Your Honor, the Government moves to

15    admit Exhibit 20.

16         MR. LARSON:  No objection, your Honor.

17         THE COURT:  20?

18         MR. KAKKAR:  Yes.  Government Exhibit 20.

19         THE COURT:  It's received.  You may publish it.

20         (Exhibit 20 identified and admitted.)

21              **PLAINTIFF'S WITNESS, VERONICA EBERHARDT, WAS SWORN.**

22                        **DIRECT EXAMINATION**

23

24    BY MR. KAKKAR:

25    Q.   Good afternoon, Ms. Eberhardt.

1    A.    Good afternoon.

2    Q.    Just so it's clear, if you want to put the microphone

3    close to your mouth so we can all hear you, I'd appreciate it.

4    Thank you.

5          Ms. Eberhardt, who are you employed with?

6    A.    The Federal Bureau of Prisons.

7    Q.    And what is your position with the Bureau of Prisons?

8    A.    I am the Correctional Systems Specialist.

9    Q.    What are your job responsibilities as the Correctional

10   Systems Specialist?

11   A.    I supervise the receiving and discharge department and

12   also inmate records.

13   Q.    And what does a Correctional Systems Specialist do?

14   A.    We ensure that every inmate coming into our custody is --

15   has the appropriate paperwork and that they are all keyed into

16   our system correct.

17   Q.    When you say *keyed into our system*, do you mean the United

18   States Bureau of Prisons?

19   A.    Yes.

20   Q.    So does that mean anytime someone is entered into federal

21   custody a Correctional Systems Specialist will enter in that

22   information?

23   A.    Correct.

24   Q.    And how long have you had this job?

25   A.    For 12 years.

1    Q.    So I'm putting -- if you don't mind pulling out

2    Exhibit 20.  There's a folder.

3           Ms. Eberhardt, are you familiar with what Exhibit 20

4    is?

5    A.    Yes.

6    Q.    Could you, please, describe what is Exhibit 20?

7    A.    This is the sentry history for an inmate that is -- any

8    time they come in or out of any BOP facility.

9    Q.    What is sentry history?

10   A.    Basically, a chronological order of what we input for the

11   inmate when they come in, and also any time they leave our

12   facility, it gets keyed into the system.

13   Q.    And for which inmate is this?

14   A.    Whittington, Jerome.

15   Q.    So, Ms. Eberhardt, if you can look at this document, and

16   just, generally, what does the left column signify?

17   A.    The left column is the abbreviation of the *Facility* where

18   he is.

19   Q.    And are these abbreviations for federal facilities?

20   A.    Yes, the ones with the letters.

21   Q.    And then what is under the column for *Description*?

22   A.    Is how he was admitted into the facility.

23   Q.    And what does the *Start Date* signify?

24   A.    The start date is the start that he was either released or

25   -- keyed in or released.

1    Q.    When you mean *keyed in*, do you mean when they come into

2    the facility?

3    A.    Correct.

4    Q.    And what is the *Stop Date*?

5    A.    It's when he was released.

6    Q.    So earlier you were testifying about inmates coming into

7    facilities, is that when someone would input the start date?

8    A.    Correct.

9    Q.    And when that inmate, then, leaves the facility, is that,

10   then, the stop date?

11   A.    Correct.

12   Q.    Based on your review of this document -- I'm going to have

13   you turn to -- look at the bottom of the first page.  I'm going

14   to call out the bottom.  I'm going to highlight one of the

15   lines.  Can you, please -- are you able to read the call-out on

16   the screen?

17   A.    Yes.

18   Q.    Can you, please, read to the jury the highlighted line?

19   A.    It states that he was at the Taft Correctional Facility.

20   He was there as a designated inmate.  He was keyed in on

21   2-15-2005.  And it looks like he released on 12-1-2006.

22   Q.    Then if you don't mind taking a minute or just reviewing

23   -- or however long you need to review the rest of the

24   document -- and if you can let me know if this inmate had been

25   entered into the Taft facility prior to this time?

1    A.    There is no other history of him being at Taft.

2    Q.    Then I'm going to ask you to review under that.  Prior to

3    him arriving at Taft for the first time on February 15th, 2005,

4    based on the sentry report, at least on this first page, where

5    was he coming from, if you can tell?  And if you need to refer

6    to the second page, please let me know.

7    A.    It just shows that he was in a transit facility.  It

8    wasn't a BOP facility.

9    Q.    So I'm going to turn to the second page.  So let's go

10   backward.  The first line says *Released from in transit*

11   *facility 10-23-2003.*  Is that what you were saying earlier; he

12   was in some in transit facility before?

13   A.    Correct.

14   Q.    Are you able to tell where he was during this time?

15   A.    Not the ones that have the numbers.  Those aren't BOP

16   facilities.

17   Q.    When you mean the numbers?  Do you mean the 4-T?

18   A.    Yes, -T.  Sheridan was the last federal facility prior to

19   Taft.

20   Q.    And is that the --

21   A.    The SHE.

22   Q.    That would be the third line from the top, that he was in

23   Sheridan from June 25th, 2003, to February 16th, 2005?

24   A.    Correct.

25   Q.    That's he was in Sheridan?

1    A.    Yes.

2    Q.    And then where was he prior to June 2003, based on these

3    records?  Before June 25th, 2003?

4    A.    The next federal facility would be Dublin.

5    Q.    So -- sorry.  If I could direct your attention to the

6    fourth line where it says, *SHE A-DES designated at assigned*

7    *facility from 1-192002 to June 25th, 2003*.  What does that line

8    mean?

9    A.    It means that that is -- he was keyed in back into the

10   facility on that date.

11   Q.    At Sheridan?

12   A.    Yes, at Sheridan.

13   Q.    If you can direct your attention back to the first page,

14   you can feel free to point to me where it will reflect that?

15   Where did he go after he was in Taft based on these records?

16   So he was in Taft from -- through December 1st, 2006.  And then

17   after Taft, does it reflect if he was in federal custody?

18   A.    Where it says OKL.

19   Q.    Uh-huh.

20   A.    That would be Oklahoma.

21   Q.    And that was the federal facility?

22   A.    Yes.

23   Q.    Am I calling up the right area?

24   A.    Yes.  That's correct.

25   Q.    So he left -- does this document reflect that he left Taft

1   in December 1st, 2006?

2   A.    Yes.

3   Q.    And then he was somewhere not in federal custody and goes

4   back to Oklahoma in June 2007?

5   A.    Yes.

6   Q.    Based on this record, can you describe where he went after

7   Oklahoma?

8   A.    After Oklahoma, it looks like he was designated at FOR

9   City, and that's FOR, Kon 7-9-2007.

10   Q.    So I'm going to highlight that line.  Is that at the

11   bottom?

12   A.    Yes.

13   Q.    *FOR*?

14   A.    Yes.

15   Q.    And then after that point?

16   A.    After that it looks like he was designated to our

17   community corrections facility, which is the CLB.

18   Q.    On what date?

19   A.    On 12-17-2007.

20   Q.    And what is a community corrections facility?

21   A.    Community corrections is, normally, when an inmate is

22   still serving bureau custody but is allowed to go to a halfway

23   house.

24   Q.    And then where did he go after this community corrections

25   facility?

1    A.    It looks like he returned -- actually, on 6-13-2008 it

2    looks like he was released from custody from his sentence as

3    good conduct time released.

4    Q.    Is that what I just highlighted?

5    A.    Yes.

6    Q.    Okay.

7    A.    And then he came back in to federal custody on 10-1-2014

8    in Oklahoma.

9              MR. KAKKAR:  Your Honor, may I have a moment?

10             THE COURT:  Yes.

11   BY MR. KAKKAR:

12   Q.    So Ms. Eberhardt, I just want to focus back again on the

13   Taft designation.  So you had stated that the first time that

14   he was at Taft was December 1st -- I'm sorry -- February -- I

15   should zoom this in.  I apologize.

16             He was designated at Taft February 15th, 2005?

17   A.    Correct.

18   Q.    So he was not at Taft before that time?

19   A.    Correct.

20   Q.    In -- and in 2003 you had mentioned that he was in two

21   different places.  Which federal facility was he at in 2003?

22   A.    In 2003 he was in Sheridan.

23   Q.    And that was from June 25th onward?

24   A.    2003, June 25th, yes.

25   Q.    I'm sorry.  So -- I'm sorry.  Could you actually explain

1    in 2003, based on your records, where was he confined?

2    A.    In Sheridan.

3    Q.    In Sheridan?

4    A.    Yes.

5    Q.    And so the line that says 4-T admitted June 25th, 2003, to

6    October 2003, you had mentioned this is local custody?

7    A.    He was released from Bureau of Prisons custody.  He was

8    still in custody, just we don't know where.

9    Q.    So if he was in Taft in this year, it would reflect Taft?

10   A.    Correct.  Yes.

11            MR. KAKKAR:  No further questions.

12            THE COURT:  Thank you.

13                        **CROSS-EXAMINATION**

14   BY MR. LARSON:

15   Q.    Good afternoon, Ms. Eberhardt.

16   A.    Good afternoon.

17   Q.    You were interviewed by the FBI on June 17th -- no, I'm

18   sorry, June 15th, 2016; is that correct?

19   A.    Correct.

20   Q.    So that was just two months ago?

21   A.    Yes.

22   Q.    And you were visited at your place of employment at the

23   Metropolitan Detention Center in Los Angeles by the Assistant

24   USA attorney who just examined you, correct?

25   A.    Correct.

1    Q.   Along with Special Agent Timothy Broomhead and Marcus

2    Golusin?

3    A.   Correct.

4    Q.   They took notes of your interview?

5    A.   I believe so.

6    Q.   You know normally the FBI normally does a report after

7    they do an interview, right?

8    A.   I would assume.  I'm not sure.

9    Q.   How long have you been in federal law enforcement?

10   A.   For 16 years.

11   Q.   You don't know that the FBI generally does a report when

12   they do an interview?

13   A.   No.

14          MR. KAKKAR:  Objection.  Facts not in evidence if the

15   witness is in law enforcement.

16          THE COURT:  Sustained.

17   BY MR. LARSON:

18   Q.   You work for the Bureau of Prisons?

19   A.   Correct.

20   Q.   Do you consider yourself part of law enforcement?

21   A.   Correct.

22   Q.   Okay.  In any event, you were interviewed about this

23   document that was just placed in front of you, correct?  I

24   think it's Exhibit No. 20.

25   A.   Yes.

```
1    Q.   And you indicated that -- well, actually, you provided the

2    copy of the sentry record for Mr. Whittington to the FBI,

3    correct?

4    A.   Yes.

5    Q.   You generated this document?

6    A.   Yes.

7    Q.   It's a document that's, normally, held by the -- in the

8    BOP system as a business record, essentially, correct?

9    A.   Yes.

10   Q.   I want to focus on that time in 2003, because that's

11   important.  On page 2 of the document -- on page 2003 -- I mean

12   on page 2 I have highlighted the line that counsel was just

13   asking you about, the June 25th, 2003, to February 16th, 2005.

14   You see that?

15   A.   Yes.

16   Q.   Now, you testified -- I think you were asked the question

17   twice about where that was and you said that means that he was

18   in Sheridan, correct?

19   A.   Yes.

20   Q.   And Sheridan is a federal facility?

21   A.   Correct.

22   Q.   Is it true that you told the FBI this two months ago when

23   you were interviewed that *From June 25th, 2003, to*

24   *February 15th, 2005, the sentry record reported Whittington was*

25   *in IAD* -- and you see the IAD next to the SHE -- *which*
```

1   *Everhardt indicated likely means state custody.  Neither the*

2   *sentry record nor USM 129 indicates Whittington's exact*

3   *location in state custody.*  Is that a true statement?

4   A.   Is that what?

5   Q.   Ma'am, my question is is that a true statement?

6   A.   Yes.

7   Q.   So the IAD actually indicates he was in state custody, not

8   in Sheridan?

9   A.   No.  It just reflects that he went out on an exchange

10  agreement.

11  Q.   Out of the federal facility into a state facility,

12  correct?

13  A.   Yes.

14  Q.   So he was not in the federal facility at Sheridan,

15  correct?

16  A.   Correct.

17  Q.   So he could have been in the county of Riverside jail,

18  correct?

19  A.   I don't know.

20  Q.   You have no idea?

21  A.   No.

22  Q.   But he wasn't at Sheridan according to this sentry report?

23  A.   That's correct.

24  Q.   So what you stated to the Assistant U.S. Attorney, right,

25  a few moments ago is not accurate, correct?

1    A.    For?

2    Q.    That entry.

3    A.    Correct.

4          MR. LARSON:  Your Honor, I'd ask that the Defense

5    Exhibit 492 be placed before the witness, specifically turning

6    to page 152002.  And just for the witness.  I want to make sure

7    that this witness can identify this document.

8          (Exhibit 492 identified.)

9    BY MR. LARSON:

10   Q.    Ma'am, I just want you to look at three pages.  The first

11   page has a number in the bottom right-hand corner, 152002.  Do

12   you see that?

13         THE COURT:  You want to give her the page number

14   again?

15         MR. LARSON:  I'm sorry.  152002.  It's in the bottom

16   right-hand corner.

17   Q.    Do you see that?  We're in Exhibit 492.  There's a bunch

18   of pages in there, and we're looking for page 152002.

19   A.    Yes.

20   Q.    Do you see that?

21         What I would like you to do for a moment is look at

22   that page and then the next two pages, 152003 and 152004.

23   Actually, why don't we just -- why don't we go through the

24   whole document.  There's eight pages, actually.  Why don't you

25   go all the way to 152008.  I just have questions on the first

1    three, but that's the entirety of the document.

2              Do you recognize this document?

3    A.    Yes.

4    Q.    It's entitled, *United States Marshal Service Prisoner*

5    *Tracking System*.   Is that a document that's also like the

6    sentry log, something that's part of the U.S. Marshal Service

7    or Bureau of Prisons?

8    A.    It's part of the marshal service.

9    Q.    Is it a document -- a type of document that you're

10   familiar with?

11   A.    Yes.

12   Q.    Is it something that you rely upon in your position?

13   A.    To a certain extent.

14             MR. LARSON:   Your Honor, I would move to admit just

15   these pages from the exhibit, these eight pages.

16             MR. KAKKAR:   No objection.   Just to be clear, are the

17   eight pages 152002 through --

18             MR. LARSON:   152008.

19             MR. KAKKAR:   Yes.   Okay.   No objection to those

20   pages.

21             THE COURT:   Received.

22             (Exhibit 492 admitted.)

23   BY MR. LARSON:

24   Q.    So you see in this document this refers to Mr. Jerome

25   Arthur Whittington, correct?

1   A.   Correct.

2   Q.   And that's the same person that you ran the sentry report

3   on, correct?

4   A.   Correct.

5   Q.   And it has various identification numbers.  Do you see in

6   the third box from the top the remarks?  There's an entry

7   there.  Could you indicate -- read what that says?

8   A.   *Escape risk.  FBI most wanted.  Important.  See number 8.*

9   Q.   What does that mean to you?

10  A.   To me, actually, I wouldn't -- wouldn't look at this.

11  That's not what I use this document for.

12  Q.   Let's turn to the second page, page 2.  You see the phrase

13  that I've highlighted at the top, *Prisoner Alias*?

14  A.   Yes.

15  Q.   And you see a whole bunch of names under that?

16  A.   Correct.

17  Q.   It actually goes the full -- I haven't counted how many

18  there are there, but there are a bunch of names on that page,

19  correct?

20  A.   Correct.

21  Q.   It goes over to the next page, page 3, and it continues,

22  right?

23  A.   Correct.

24  Q.   What are those?

25  A.   Prisoner aliases.

UNITED STATES DISTRICT COURT

1  Q.    Okay.  Describe for the jury -- I know what an alias is.

2  I want to make sure the jury understands.  Describe for the

3  jury what *alias* means?

4  A.    Normally, it's a name -- or a different name that an

5  inmate or that person has been known to use.

6  Q.    And that information is, normally, obtained from what

7  source?  Where would someone in the marshal service obtain that

8  information?

9  A.    I don't know.  I don't work for the marshal service.

10  Q.    Where would the Bureau of Prisons obtain it?

11  A.    Normally, we get information from the marshal's, this

12  document.

13  Q.    So you rely on the marshal service, but you don't know

14  where the marshal service comes up with all these aliases?

15  A.    Correct.

16          MR. LARSON:  I have no further questions.

17          THE COURT:  Mr. Kakkar.

18          MR. KAKKAR:  No further questions.

19          THE COURT:  Thank you.  Ms. Eberhardt, you're

20  excused.

21          Mr. Kakkar.

22          MR. KAKKAR:  Your Honor, that concludes the witnesses

23  for today.

24          THE COURT:  Very well.  So we will recess for today?

25  Is that correct?

**Exhibit B**

```
 1              MR. KAKKAR:  Your Honor, may I confer with counsel
 2    briefly?
 3              THE COURT:  Yes.
 4              THE COURTROOM DEPUTY:  Please raise your right hand.
 5              Do you solemnly swear the testimony you are about to
 6    give in the cause now pending before this Court will be the
 7    truth, the whole truth, and nothing but the truth so help you
 8    God?
 9              THE WITNESS:  Yes, I do.
10              THE COURTROOM DEPUTY:  Thank you.  Please have a
11    seat.
12              If you can state your full name for the record and
13    spell your first and last name.
14              THE WITNESS:  Sure.  My full name is Mark, M-a-r-k,
15    middle initial C, last name of Hunter, H-u-n-t-e-r.
16              THE COURT:  You may proceed.
17              MR. KAKKAR:  Thank you, your Honor.
18              Your Honor, I apologize.  The system is not on so I'm
19    just turning it on.
20              THE COURT:  Mr. Galvez may help.
21              **PLAINTIFF'S WITNESS, MARK C. HUNTER, WAS SWORN**
22                          **DIRECT EXAMINATION**
23    BY MR. KAKKAR:
24    Q.   Good morning, Special Agent Hunter.
25    A.   Good morning.
```

1   Q.   What is your current position?

2   A.   My current position is a Senior Special Agent with

3   Department of Treasury, a group called SIGTARP, which is the

4   Office of Special Inspector General, the Troubled-Asset Relief

5   Program.

6   Q.   And what does SIGTARP do?

7   A.   SIGTARP, the section that I work with, they investigate

8   waste, fraud, and abuse related to the Troubled-Asset Relief

9   Program.

10  Q.   Prior to this position, where were you employed?

11  A.   I was employed with the Federal Bureau of Investigation

12  for 26 years, the FBI.

13  Q.   And as part of your responsibilities at the FBI, have you

14  analyzed bank records?

15  A.   Yes, I have.

16  Q.   How about phone records?

17  A.   Yes, I have.

18  Q.   Special Agent Hunter, could you please review Exhibit 9?

19  It's a separate binder behind you.

20  A.   Not this binder?

21  Q.   It should be Volume --

22  A.   Okay.  I have Exhibit 9 in front of me.

23  Q.   Could you please describe what Exhibit 9 is?

24  A.   Yes.  These are bank records from Bank of America relating

25  to an account in the name of Jerry Whittington.

```
 1              (Exhibit 9 identified.)

 2  BY MR. KAKKAR:

 3  Q.   Now could you please review Exhibit 9-A.  Let me know when

 4  you've reviewed Exhibit 9-A?

 5  A.   Yes.  This, again, are bank records from Jerry Whittington

 6  Bank of America account.  They are excerpts from Exhibit 9.

 7              MR. KAKKAR:  Your Honor, the Government moves to

 8  admit Exhibit 9-A.  The 902(11) was lodged with the Court.

 9              MR. LARSON:  No objection, your Honor.  May publish.

10              THE COURT:  Very well.  It's received.  You may

11  publish.

12              THE COURT:  You said 9-A or 9 and 9-A?

13              MR. KAKKAR:  9-A only.

14              THE COURT:  9-A only, very well.

15              (Exhibit 9-A identified and admitted.)

16  BY MR. KAKKAR:

17  Q.   All right.  Special Agent Hunter, I'm going to point out

18  specific pages on the screen in front of you.  I'm on

19  page 146654.  It's also page 16 of the document itself.

20              Special Agent Hunter, can you please read the wire

21  transaction on October 26th?

22  A.   Yes.  This -- this is an incoming wire transfer dated

23  October 26th, 2009.  And it's in the amount of $100,000.  And

24  it originated from Carl Vienna.

25  Q.   All right.  Special Agent Hunter, for the record I'm going
```

1    to be turning to documents Bates number 146754.  It is also

2    page 27 of Exhibit 9-A.

3             Special Agent Hunter, would you please read the

4    transaction that is called out?

5    A.   Yes.  This is a transaction that occurred on August 2nd,

6    and it's a $5,000 withdrawal.  It's a transfer to checking

7    account ending in the last four digits 3534.

8    Q.   Thank you.  For the record I'm now turning to Bates

9    page 146819, which is page 55 of Exhibit 9-A.

10            Special Agent Hunter, I'm going to be highlighting a

11   few transactions that I would ask you to read to the jury -- if

12   you just give me a moment, I will highlight them.

13            Special Agent Hunter, I've highlighted four

14   transactions.  If you could, please, read those transactions to

15   the jury.

16   A.   Sure.  These are all dated 2011.  The first one is

17   January 7th.  It's a cash withdrawal for $60.  The second

18   transaction is, again, on January 7th and it's for 108.37.  The

19   third transaction is January 7th for $121.92.  And the fourth

20   transaction is January 7th and it's in the amount of $607.20.

21   Q.   With respect to the first transaction, do the records

22   indicate that a card was used -- or I'm sorry.

23            You mentioned that the first transaction is a cash

24   withdrawal?

25   A.   Yes.

1  Q.   And then the second and third transactions, does it

2  indicate that a card was used?

3  A.   Yes.

4  Q.   Or, I'm sorry, just the records reflect a card number,

5  correct?

6  A.   That's correct, a card number.

7  Q.   The last transaction, does it reflect a check card

8  purchase?

9  A.   Yes.

10  Q.   Finally, for the record, I'm going to turn to page -- the

11  page marked as 146820 with -- which is page 56 of Exhibit 9-A.

12        Special Agent Hunter, could you, please, read that

13  transaction to the jury?

14  A.   Yes.  Again, this is dated 2011.  It's January 11th and

15  it's a transfer to checking account 3534 in the amount of $500.

16  Q.   Thank you.  You can put Exhibit 9-A to the side.

17        If I could have you pull out Exhibit 10, please.

18  Please let me know when you're done reviewing Exhibit No. 10.

19  A.   Yeah, I'm finished.

20  Q.   What is Exhibit 10?

21  A.   This is a Bank of America wire log.

22  Q.   And -- your Honor, I move to admit Exhibit 10.  The

23  902(11) certificate was lodged with the court.

24        MR. LARSON:  No objection, your Honor.

25        THE COURT:  Very well.  It's received.  You may

1    publish.

2             (Exhibit 10 was identified and admitted.)

3    BY MR. KAKKAR:

4    Q.   Special Agent Hunter, could you, please, summarize the

5    wire transaction that is represented in Exhibit 10?

6    A.   Yes.  This is a wire transfer.  It's from Ryszard

7    Scislowski in the amount of $5,500, and it's to Jerry

8    Whittington.  The date of it is January 7th, 2011.

9    Q.   I'm now going to turn to the second page of Exhibit 10,

10   which is identified with Bates number 1360330.

11            Special Agent Hunter, could you, please, summarize

12   the wire transaction that is reflected on the second page of

13   Exhibit 10?

14   A.   Yes.  This is dated January 13th, 2011, and it's in the

15   amount of $3,000.  It is to Jerry Whittington from Ryszard

16   Scislowski.

17   Q.   Thank you.  You can put that exhibit to the side.

18            If you could please review Exhibit 11 in the folder

19   in front of you.  Is that a disk?

20   A.   Yes, it is.

21            (Exhibit 11 identified.)

22   BY MR. KAKKAR:

23   Q.   Do you know what's on that disk?

24   A.   I do.

25   Q.   What is on that disk?

1   A.   This is Verizon phone records subpenaed by the Federal

2   Bureau of Investigation.

3   Q.   How do you know what's what's on the disk?

4   A.   Because I've reviewed this disk, and it's my handwriting

5   on the outside of it.

6   Q.   If I could have you take a look at Exhibit 11-A.  Could

7   you, please, describe what is Exhibit-11-A?

8   A.   Yes.  This is excerpts from 11.  And the top page here,

9   these are Verizon phone records in the name of Kathleen Moore.

10  This is the cover page of the bill.  And then the second page

11  is a detailed listing of call log.

12          MR. KAKKAR:  Your Honor, the Government moves to

13  admit Exhibit 11-A.  The 902(11) is lodged with the court.

14          MR. LARSON:  No objection.

15          THE COURT:  Received.  You may publish.

16          (Exhibit 11-A identified and admitted.)

17  BY MR. KAKKAR:

18  Q.   Special Agent Hunter, you just mentioned that these are

19  excerpts from Exhibit 11?

20  A.   Yes.

21  Q.   And are both of the excerpts from the same month of the

22  bill?

23  A.   Yes.

24  Q.   What year does the bill cover?

25  A.   2009.

1  Q.   I'm going to have you -- I'd like to direct your attention
2  to the second page of Exhibit 11-A.  I'm going to be
3  highlighting two calls.  If you could, please, read those two
4  -- summarize those two calls to the jury.
5  A.   Yes.  These are calls that occurred on May 13th, 2009.
6  The first one is at 1:15 p.m. and it's to 626 -- the phone
7  number it's to is (626) 705-0600.
8  Q.   Special Agent Hunter, when it says *Incoming CL* for the
9  first call, do you understand what that means?
10 A.   Yes.
11 Q.   So is that an incoming call?
12 A.   Yes.
13 Q.   Can you, please, review the second call?
14 A.   Yes.  The second call is on May 13th at 1:17 p.m.   And
15 the phone number is (626) 705-0600.
16 Q.   Thank you.  You may put that exhibit away.
17         Can you please review Exhibit 14?  Can you, please,
18 describe what is Exhibit 14 in general nature?
19 A.   Yes.  These are search logs from a company called Merlin.
20         (Exhibit 14 identified.)
21 BY MR. KAKKAR:
22 Q.   And for what account are these search logs for?
23 A.   For -- this is for Herrera Investigations.
24 Q.   Special Agent Hunter, could I have you look at
25 Exhibit 14-A?

```
 1              (Exhibit 14-A identified.)
 2         MR. LARSON:  Your Honor, I have a foundational
 3  objection here before we go further in terms of this witness?
 4         THE COURT:  He hasn't offered it to be introduced
 5  yet.
 6  BY MR. KAKKAR:
 7  Q.   Could I have you look at Exhibit 14-A?
 8  A.   Yes.
 9  Q.   What is Exhibit 14-A?
10  A.   14-A is an excerpt from 14.
11         MR. KAKKAR:  Your Honor, the Government would move
12  admit to admit the 14-A.  The 902(11) for 14 was lodged with
13  the court.
14         MR. LARSON:  I don't have any problem with the
15  document itself, but I believe the only foundational questions
16  asked of this witness were related to phone records and bank
17  accounts, and if he's going to be asked questions about
18  interpreting these Merlin records, I'd like a foundation laid.
19         THE COURT:  Very well.  So to the extent that there
20  has been no foundation laid, then I'll sustain the objection.
21         MR. KAKKAR:  Your Honor, does the Court receive
22  Exhibit 14-A?
23         THE COURT:  There's an objection on foundation and
24  it's sustained.
25         MR. KAKKAR:  Your Honor, my understanding was that if
```

1    there was a question, that would be the foundational issue but

2    the document itself could come in.

3              THE COURT:  Well, Mr. Larson, clarify, is there an

4    objection to the exhibit being received based on foundation?

5              MR. LARSON:  Yes, your Honor.  I just think a

6    foundation needs to be laid.  I don't know where this document

7    was obtained.  I think this witness -- he was called to be a

8    telephone and a bank account witness.  He may very well have

9    the foundation; I just don't know.  There's been no foundation

10   laid for this document with this witness.

11             THE COURT:  Sustained.

12             MR. KAKKAR:  Your Honor, the 902(11) was lodged with

13   the court.  So this record goes to the 902(11), so the

14   Government has moved in a self-authenticating --

15             THE COURT:  What do you mean?  Say that again.

16             MR. KAKKAR:  This is a business record, your Honor,

17   so -

18             MR. LARSON:  Your Honor, he has to lay the foundation

19   for a business record from what -- how this witness got it.

20             THE COURT:  Correct.

21             MR. LARSON:  He's just assuming this is going to come

22   in.  There needs to be a foundation laid.

23             THE COURT:  You have to -- even for a business

24   record, you have to lay the foundation for a business record.

25             MR. KAKKAR:  Even with the 902(11), your Honor?

1          THE COURT:  What do you mean -- approach.

2          (Outside The Presence Of The Jury:)

3          THE COURT:  By 902(11) you mean self-authenticating?

4          MR. KAKKAR:  Yes, your Honor.  The foundation would

5     be for what --

6          THE COURT:  For this witness's knowledge as to what

7     that is and whether it's legitimate.

8          MR. KAKKAR:  The Government would assume it could be

9     moved in regardless of a witness.  We're asking this witness to

10    read transactions.  We'd move this exhibit in regardless of the

11    witness on the stand to which the defendant has not objected.

12    So the Government filed the 902(11), lodged it with the court.

13    This could be admissible without the witness.  We're asking the

14    witness to read three transactions.

15         MR. LARSON:  It may be self-authenticating, but it's

16    not self-explanatory.  You have an ability under 401 and 403 to

17    regulate what evidence goes before this jury.  This is a

18    complicated document.  I'm sure this witness could probably

19    explain this document.  He's an FBI agent.  He's now a OIG TARP

20    agent.  I'm asking to have that foundation laid.  This is a

21    record that is very complicated.  I think it's confusing to the

22    jury.

23         THE COURT:  Ask the witness if he knows what this

24    document is and how it's generated and what does it attempt to

25    explain.

1          MR. KAKKAR:  Will your Honor receive the exhibit if

2    we were not to have the testify about it whatsoever?

3          MR. LARSON:  I would object on 401 and 403 grounds.

4    They're putting before the jury a complicated document.  It

5    needs to be explained to the jury before it's received.  To

6    introduce documents that are, perhaps, self-authenticating but

7    by no means self-explanatory --

8          THE COURT:  What is this witness's knowledge about

9    how this document is generated?

10         MR. KAKKAR:  My understanding is he probably would

11   know because he's seen the FBI files.  If the Government

12   doesn't need to have him read it -- these are documents that

13   the defendant agreed to stipulate to, and so we would not --

14   for purposes of authenticity, and so the Government doesn't

15   need to have the witness testify about it.  It's relevant

16   because it's referenced in the indictment.  The defendant

17   searched his own account so the Government would move to admit

18   the exhibit in and of itself without the witness testifying.

19         MR. LARSON:  Mr. Behnke can speak to the agreement.

20   He worked that out.  I can't, your Honor.

21         MR. BEHNKE:  We agreed that there -- the

22   certification that they received from Merlin would establish

23   that this is, in fact, a document that came from Merlin.  I

24   also told them that without an appropriate witness, they were

25   going to have a problem explaining to the jury what the

1   document means.  Because it is a complicated document.  And

2   without a witness who can explain to the jury what they're

3   looking at, the document is meaningless.  And I told them that

4   although the certification was okay, that we were going to

5   have, potentially, other objections to the document besides the

6   authenticity of the certification.

7         THE COURT:  Ask the witness if he knows what this

8   document is and what it's intended to establish.

9         MR. KAKKAR:  I understand that, your Honor, if we had

10  a witness -- what I'm asking is can we move it in without the

11  witness?

12        THE COURT:  No, you can't.  Nobody knows what the

13  document is supposed to portray.  It's self-authenticating --

14        MR. KAKKAR:  It's self-authenticating and it's not

15  hearsay.  The Government's position is that the document is

16  self-explanatory.

17        THE COURT:  What do you mean the document is

18  self-explanatory?

19        MR. KAKKAR:  Exhibit 14.  If the Government were to

20  move in Exhibit 14 --

21        THE COURT:  The fact that it says *Merlin Published*

22  *Search Logs* doesn't explain anything.  Nobody knows what the

23  Merlin Published Search Log is.  What is it supposed to explain

24  on this document as to what that is?

25        MR. LARSON:  I don't know what a published search log

1    is.

2            MR. KAKKAR:  Your Honor, it shows a user ID and it

3    shows searches.  So the jury doesn't need to know what the

4    Merlin Power Search Log is.  The jury can understand these are

5    searches performed by Herrera.

6            MR. LARSON:  You see what he's trying to do.  He's

7    trying to stick a document before the jury that they don't know

8    anything about, that has no explanation, that has Mr. Herrera's

9    name on it.

10           THE COURT:  I understand.  I understand it says

11   Herrera and I understand what it says.  I just don't understand

12   that the jury would understand where this came from, how it's

13   generated, and how it's related to this case.  Where in here

14   does it say it's related to this case or how it's --

15           MR. KAKKAR:  For, instance once it's received into

16   evidence, we can show where the document speaks for itself that

17   searches for Pacific Property Assets occurred May 13th, 2009.

18           THE COURT:  You don't know that this is a search just

19   by looking at the document.  How do you know that it's a search

20   by looking at this?

21           MR. KAKKAR:  It's a search log, and it states it at

22   the top that it's a search log.

23           THE COURT:  Yeah.  What is a Merlin Power Search Log?

24   How is it generated?

25           MR. KAKKAR:  Your Honor, the point of both 803(a) and

```
 1   902(11) is that these documents can be admitted without having

 2   that foundational testimony about the document.

 3          MR. LARSON:  But there's also other rules of evidence

 4   that govern the admissibility, and they must all be taken

 5   together.  If this is too confusing --

 6          THE COURT:  Ask the witness what his understanding of

 7   a Merlin Power Search Log is.

 8          MR. KAKKAR:  Okay.

 9          (In the Presence of the Jury:)

10          MR. KAKKAR:  Your Honor, may I have a moment to

11   confer with counsel?

12          THE COURT:  Yes.

13   BY MR. KAKKAR:

14   Q.   Special Agent Hunter, in your experience do you know what

15   Merlin search is?

16   A.   Yes, I do.

17   Q.   What is Merlin search?

18   A.   Merlin is -- it's a pay-for site database.  It's a service

19   that's commonly used by private investigators.

20   Q.   And do private investigators have accounts with Merlin?

21   A.   Yes.

22   Q.   To your knowledge?

23   A.   Yes.

24          MR. KAKKAR:  Your Honor, I move to admit

25   Exhibit 14-A.
```

```
 1              THE COURT:  Received.

 2              MR. LARSON:  No objection, your Honor.

 3              THE COURT:  You may publish.

 4          (Exhibit 14-A admitted.)

 5  BY MR. KAKKAR:

 6  Q.   Special Agent Hunter, I'm going to call out several lines

 7  of this search result -- or I'm sorry, this document.  And are

 8  the headings in each column reflected on Exhibit 14-A -- 14,

 9  I'm sorry?

10  A.   No.  Yeah, they're reflected on Exhibit 14.

11              MR. KAKKAR:  So, your Honor, the Government would

12  also move to admit the first page of Exhibit 14.

13              MR. LARSON:  No objection, your Honor.

14              THE COURT:  Received.  You may publish.

15          (Exhibit 14, page 1, admitted.)

16  BY MR. KAKKAR:

17  Q.   So first let's review the first page of Exhibit 14.  So

18  what are the columns for this document, for this Merlin Power

19  Search Log?

20  A.   The first column is the number, second is Log Time, next

21  column is Type, Product Description, IP Address, Client

22  Reference, User ID, Amount Charged, and Search Information.

23  Q.   Thank you.  So I'm going to call up on the screen just the

24  first page of Exhibit 14 and the first page of Exhibit 14-A and

25  keep the column information zoomed out.
```

```
1              And if I could have you read the items between
2    numbers 85 through 88, if you could just briefly summarize the
3    date, the client reference, the user ID, and the search
4    information?
5    A.   Okay.  Transaction number 85.  The product description was
6    Property.  The client reference was JW.  User ID was
7    HerreraINV.  And the information -- the search information was
8    Pacific Property Assets.
9    Q.   And what would be the search information for the second
10   line, for which business name?
11   A.   For -- you mean for number 86.
12   Q.   Yes, for number 86.
13   A.   Yes.  That's Pacific Property Assets, LLC.
14   Q.   How about for what was the search name for number 87?
15   A.   87 was Pacific Property Assets.
16   Q.   And how about the search information for 88?
17   A.   PPA Holdings, LLC.
18   Q.   And for all of these are the client reference JWK?
19   A.   Yes.
20   Q.   And for all of these is the user ID HerreraINV?
21   A.   Yes.
22   Q.   Thank you.  You can put those two exhibits away.
23           If I can have you look at Exhibit 15.
24           Your Honor, may I respond to defense counsel briefly?
25           THE COURT:  Yes.
```

UNITED STATES DISTRICT COURT

1           (Exhibit 15 identified.)

2    BY MR. KAKKAR:

3    Q.   Special Agent Hunter, do you know what Exhibit 15 is?

4    A.   I do.  These are bank records obtained by the FBI, Bank of

5    America records in the name of Jerry Whittington.

6    Q.   And could you please review Exhibit 15-A?

7    A.   Yes.  15-A is an excerpt of 15.

8           MR. KAKKAR:  Your Honor, the Government moves to

9    admit Exhibit 15-A.  The 902(11) was lodged with the court.

10          MR. LARSON:  No objection.

11          THE COURT:  Received.  You may publish.

12          (Exhibit 15-A identified and admitted.)

13   BY MR. KAKKAR:

14   Q.   Special Agent Hunter, I'm going to project on the screen

15   both pages of Exhibit 15-A.

16   Q.   I'm going to call out the information on the check.  If

17   you could, please read the basic information of the check.

18   A.   Yes.  This is a check dated October 28th, 2010, and it's a

19   cashier's check payable to David Herrera in the amount of

20   $1,000.  And the remittitur, or the person it was purchased by,

21   is listed as Jerry Whittington.

22   Q.   The check is made to the order of whom?

23   A.   It's made payable to David Herrera.

24   Q.   And what does the check reflect as the banking center

25   where it was obtained?  The banking center as indicated?

```
 1   A.   Oh.  Irvine.

 2   Q.   And the first page, is that an endorsed copy of the check?

 3   A.   Yes, it is.

 4   Q.   Thank you.  You can put Exhibit 15-A aside.

 5            Your Honor, may I approach defense counsel briefly?

 6            THE COURT:  Yes.

 7   BY MR. KAKKAR:

 8   Q.   Special Agent Hunter, could you please review Exhibit 26?

 9   A.   Yes.

10   Q.   Is Exhibit 26 a disk?

11   A.   Yes.  It's a DVD.

12            (Exhibit 26 identified admitted.)

13   BY MR. KAKKAR:

14   Q.   And what is on that DVD?

15   A.   These are Federal Bureau of Prisons records.

16   Q.   And do you know to whom the records pertain?

17   A.   Yes.  These pertain to Jerry Whittington.

18   Q.   And how do you know that's what's on the disk?

19   A.   I've reviewed this disk.  This is my handwriting on the

20   outside of it.

21   Q.   In your career are you familiar with BOP records?

22   A.   Yes, I am.

23   Q.   I'd like to have you pull out four (sic) exhibits in front

24   of you just to review, 16, 17 and 31.

25            THE COURTROOM DEPUTY 16, 17, and --
```

```
 1              MR. KAKKAR:  31.

 2              THE WITNESS:  Okay.

 3   BY MR. KAKKAR:

 4   Q.   What are those three exhibits?

 5   A.   These are excerpts from the Bureau of Prisons records that

 6   were subpenaed by the FBI.

 7              MR. KAKKAR:  Your Honor, the Government would move to

 8   admit Exhibit 16, 17, and 31.  The public record certification

 9   was lodged with the court.

10              MR. LARSON:  No objection, your Honor.

11              THE COURT:  Received.

12              MR. KAKKAR:  May I publish?

13              THE COURT:  Yes.

14              (Exhibits 16, 17, and 31 identified and admitted.)

15              MR. LARSON:  Your Honor, no objection to 16 or 18 --

16   is it 16, 17, and 18?

17              MR. KAKKAR:  16, 17 and 31.

18              MR. LARSON:  I have no objection to 16, your Honor,

19   and I have no objection to 31.  With respect to 17 there is a

20   foundational objection in terms of how this information is

21   obtained and whether or not this witness knows.

22              THE COURT:  Overruled.

23   BY MR. KAKKAR:

24   Q.   Special Agent Hunter, I'm going to have you look at the

25   first page of 16.
```

1    A.    Okay.

2    Q.    Is this a BOP record?

3    A.    Yes, it is.

4    Q.    Can you, please, read to the jury the first line of what

5    I've called out.

6    A.    Inmate Whittington arrived at Taft Correctional

7    Institution on February 15th, 2005.

8    Q.    Thank you.  You can put that exhibit aside.

9          Now I'm going to have you look at Exhibit 17.

10   Special Agent Hunter, do you know what this purports to be?

11   A.    Yes.  This is a BOP record that talks about the employer

12   possible employer information for Inmate Whittington.

13   Q.    And can you, please, identify the potential employer?

14   A.    Yes.  It's David Herrera Investigations.

15   Q.    And what is the date of this document?

16   A.    August 30th, 2007.

17   Q.    And do you know -- does the document identify which inmate

18   this pertains to?

19   A.    Yes.  It's down -- Jerome "Jerry" Whittington.

20   Q.    Now, I'm going to have you look at Exhibit 31.  What is

21   Exhibit 31?

22   A.    It's an excerpt from the whole BOP file.

23   Q.    And is this a judgment?

24   A.    Yes, it is.

25   Q.    And can you recognize from the document to whom the

1    judgment pertains?

2    A.    Yeah.   It pertains to Jerry Whittington, Jerome

3    Whittington.

4    Q.    In the upper right-hand corner there's a stamp.   What date

5    does that stamp reflect?

6    A.    October 31st, 2000.

7    Q.    And what is the offense that is indicated on this

8    judgment?

9    A.    Wire fraud.

10   Q.    Then I'm going to have you turn to the fifth page of

11   Exhibit 31.   I'm going to call out one of the paragraphs.

12   Could you, please, read that paragraph?

13   A.    Yes.   *The sentence departs from the guideline range for*

14   *the following reason:   Pursuant to USSG 4A1.2 the Court departs*

15   *upward finding that the defendant has defrauded since the 70's,*

16   *and further, the Court believes that the defendant will defraud*

17   *again.*

18   Q.    I'm going to have you turn back to the first page of 31.

19   I'm sorry, the second page.   If you can read the total period

20   of incarceration in the judgment.

21   A.    120 months.

22   Q.    In your experience do inmates usually get released before

23   their total period of incarceration?

24   A.    Yes.

25            MR. KAKKAR:   Your Honor, may I have a moment?

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Yes.

 2              MR. KAKKAR:  No further questions.

 3              THE COURT:  Thank you.

 4              Any cross-examination?

 5                      CROSS-EXAMINATION

 6   BY MR. LARSON:

 7   Q.    Good morning, Agent Hunter.

 8   A.    Good morning, Counselor.

 9   Q.    You're presently a senior supervisory Special Agent at

10   TARP, OIG TARP?

11   A.    Not a supervisory.  It's a Senior Special Agent position.

12   Q.    And you were with the FBI for 26 years?

13   A.    That's correct.

14   Q.    Where were you stationed in your later years at the FBI?

15   A.    My later years I was stationed at the Palm Springs office.

16   Q.    And Palm Springs office is right on -- is it Indian?

17   A.    Tahquitz.

18   Q.    What office?

19   A.    Tahquitz Canyon Way.

20   Q.    Isn't that right off one of the main streets of Palm

21   Springs?

22   A.    Yes.

23   Q.    You were pretty familiar with the city of Palm Springs

24   itself?

25   A.    Yes.
```

1   Q.    How long were you out there?

2   A.    I was transferred out there in the fall of -- roughly, the

3   fall of 2004, and I was there until May of 2012.

4   Q.    Okay.  So about -- almost eight years?

5   A.    Yeah.

6   Q.    Where were you before you were in the Palm Springs office?

7   A.    Before that I was in the Santa Ana office of the FBI.

8   Q.    I'm sorry.  Which office?

9   A.    Santa Ana, California.

10  Q.    So you were?

11  A.    Orange County.

12  Q.    Orange County.

13        And how long were you in the Santa Ana office?

14  A.    I arrived there December of 1990, and then I was there

15  until I was transferred out to Palm Springs.

16  Q.    You and I have known each other for a long time, haven't

17  we?

18  A.    We have.

19  Q.    All right.  I want to go through the bank records, the

20  same records you just went through with the Assistant U.S.

21  Attorney.

22  A.    Sure.

23  Q.    Let's start with Exhibit 9.  Now, Exhibit 9 is all the

24  bank records, right?  And then 9-A was just what was pulled out

25  for you to focus on, correct?

1  A.   Yes.

2  Q.   And you reviewed all the bank records in Exhibit 9?

3  A.   Yeah.  I've -- I've looked through -- I didn't do an in

4  depth analysis, but I have looked through them.

5  Q.   That's what I want to make sure, the difference between --

6  there's reviewing and there's reviewing.

7  A.   Right.

8  Q.   You were asked generally by the AUSA did you review them.

9  I want to get a sense how carefully you reviewed them.  Did you

10  look at each page, each entry, or did you work with Cathy Otis,

11  the case agent, to go to the critical months or whatever?

12  A.   The records were provided to me through the FBI, and I

13  went through -- I went through them in a summary fashion.  I

14  wouldn't say entry by entry, no.

15  Q.   What do you mean by *summary fashion*?

16  A.   Point -- looking at the significant events that would have

17  been in there, the stuff that we were -- pertinent that was

18  pointed out to me.

19  Q.   Who pointed out the significant events to you?

20  A.   Cathy and I had gone over the stuff that was, you know,

21  pertinent, applicable to the indictment.

22  Q.   So is it fair to say, then, that you looked at records

23  like the ones that have been identified by the AUSA, the dates

24  where there were transactions that they thought were relevant

25  to this case?

```
 1   A.    Yes.
 2   Q.    Well, let's start by looking at those.  Cathy Otis, she's
 3   the case agent in this case, correct?
 4   A.    Correct.
 5   Q.    Have you been referred to as the co-case agent?
 6             MR. KAKKAR:  Objection.  Vague.  By whom?
 7             THE COURT:  Overruled.
 8             MR. LARSON:  I'll withdraw the question.
 9   BY MR. LARSON:
10   Q.    Are you familiar with the phrase co-case agent?
11   A.    I am.
12   Q.    What's a co-case agent?
13   A.    Usually it's somebody -- like when I was with the FBI,
14   sometimes they would assign two people to a case, so you'd have
15   a co-case agent or -- we do that in Treasury too.  You'll have
16   one person is the lead, so there -- the job I have right now,
17   there's cases that I am the lead on, and then there's ones that
18   I am -- I don't know if we use the term co-case agent.  I think
19   it's assisting agent.
20   Q.    Were you the co-case agent in this case?
21   A.    Well, I was no longer with the FBI.  I got on this case
22   after I was with Treasury.
23   Q.    So in terms of my question, were you the -- as you define
24   that term co-case agent, were you the co-case agent in this
25   case?
```

1    A.    I would describe the FBI as the lead, Cathy Otis was the

2    case agent, and we are an assisting agency.

3    Q.    Did you review all of the documents and the interviews and

4    the investigative materials in this case?

5    A.    All of them?  No.

6    Q.    Is it fair to say that the person in charge of this

7    investigation, who would have reviewed all of that, would be

8    Cathy Otis, correct?

9    A.    Well, there's several different people that helped -- that

10   assisted with the case, so I can't say that I could say that

11   Cathy Otis, you know, knows everything and has reviewed every

12   document.  I couldn't say that.

13   Q.    Well, describe for the jury what the case agent is.  She's

14   been introduced as the case agent in this case to the jury.

15   What is a case agent in FBI parlance?

16   A.    Well, that's the person that the case gets assigned to.

17   They're an -- on investigative level, they're the ones that are

18   almost, you could think of it, in a -- like, the general

19   contractor.  So you're the person that's responsible for the

20   case.  You may have other agents assigned to help you.  You may

21   have financial analysts assigned to help you.  So you're, kind

22   of, like the general contractor for it.

23   Q.    So you said you've been assisting as -- from your position

24   in the OIG at TARP since you were there in 2012?

25   A.    No.  I think I got on this case approximately May of 2013.

1    Q.   Okay.  Fair enough.  So it was after you were at TARP,

2    though, is my point?

3    A.   Correct.

4    Q.   Why would the OIG at the Troubled Assets Relief Program,

5    which is -- TARP is the thing created by the federal government

6    to, basically, investigate fraud related to the bailouts from

7    the last great recession, right?

8    A.   Correct.

9    Q.   I'm sure that's a very poor explanation of it, but that's,

10   essentially, what it is?

11   A.   Okay.

12   Q.   Why are they involved in this investigation?

13          MR. KAKKAR:  Objection, your Honor.  May I approach

14   defense counsel?

15          THE COURT:  Yes.

16   BY MR. LARSON:

17   Q.   We'll come back to that question.

18          So you've been involved in it, though, since 2013

19   until the present?

20   A.   Yes.

21   Q.   Let's go to the Exhibit 9, which is the bank records.  You

22   have those in front of you?

23   A.   Yes, I do.

24   Q.   So the first transaction that you were asked to show was

25   on page 146554?

1   A.   Okay.  Do you want me to go to the excerpt 9-A or stay in

2   the big --

3   Q.   Exhibit 9-A.  Do you have that in front of you?

4   A.   I'm sure I can find it.  I've got it here.

5   Q.   To be clear, Exhibit 9 is all the bank records, and

6   Exhibit 9-A is just the ones that were picked out that are

7   relevant to the charges in this case, correct?

8   A.   Yes.

9   Q.   Okay.  So this bank account, the first one you looked at,

10  I believe, was 146654?

11  A.   Yes.  The $100,000, yes.

12  Q.   That was October 26th, correct?

13  A.   Correct.

14  Q.   And that was a transfer from Carl Vienna to Mr.

15  Whittington's bank account for $100,000?

16  A.   That is correct.

17  Q.   To be clear, these are Mr. Whittington's bank accounts,

18  correct?

19  A.   Yes.

20  Q.   These are not defendant David Herrera's bank accounts?

21  A.   No, they are not.

22  Q.   And there's no identification that David Herrera had any

23  involvement -- or any authority over these bank accounts, is

24  there?

25  A.   Not to my knowledge.

1    Q.   The next item you testified to, I believe, was on

2    page 146754.

3    A.   Okay.

4    Q.   And that was on August 2nd, a transfer to checking account

5    -- it was a teller transfer to checking account 3534.  So that

6    was money coming in, again, to Mr. Whittington's account,

7    correct?

8    A.   No.  This was money going out.

9    Q.   Okay.  Do you know what the checking account 3534 is?

10   A.   I would have to refresh my memory, but I've seen that

11   account number before.

12   Q.   But it's not David Herrera's account?

13   A.   No.  I do not think this is David Herrera.

14   Q.   You, certainly, would have been aware of it if it had

15   anything to do with David Herrera, right?

16   A.   Well, I'm pretty confident it's not David Herrera's.

17   Q.   All right.  Let's go on to the next one.  It's 146820.

18   A.   Okay.

19   Q.   All right.  That's the -- the focus there is on

20   January 11th, correct?  It's a $500 transfer.  This is another

21   one that's going out to another account, correct?

22   A.   Yes.

23   Q.   Do you see the account that it's going to?

24   A.   I do.

25   Q.   Do you know what account number that is?

1    A.    I do not.

2    Q.    Would you have any reason to doubt that that is Mr.

3    Vienna's account?

4    A.    Um, no.  That rings a bell to me, that I've seen that bank

5    account, that statement.

6    Q.    So that could be Carl Vienna's bank account number?

7    A.    Yes.

8    Q.    All right.  I wanted you to turn next to 146818.

9    A.    Okay.  I'm there.

10   Q.    Are you there?  And you testified about two transfers, one

11   on January 7th and one on January 13th.  This was money coming

12   in to Mr. Whittington's account; is that correct?

13   A.    That is correct.

14   Q.    One in the amount of $5,500 and one in the amount of

15   3,000?

16   A.    Correct.

17   Q.    So for a total of $8,500 came in, the first on January 7th

18   and the second on January 13th, correct?

19   A.    Correct.

20   Q.    You're familiar with the indictment in this case, the

21   second superseding indictment which contains the charges

22   brought by the Government?

23   A.    Yes.

24   Q.    I'm going to show you from the indictment the actual

25   charges.  You understand that Mr. Herrera has been charged with

1    conspiring to commit wire fraud, correct?

2    A.   That's correct.

3    Q.   And that's contained in Count 3 of the indictment, the

4    conspiracy to commit wire fraud, correct?

5    A.   I'd have to review the indictment.  I don't know the exact

6    counts.

7    Q.   All right.  Well, let me show this to you.  I'm going to

8    place before you --

9            MR. KAKKAR:  Objection, your Honor, about displaying

10   the indictment.

11           THE COURT:  The indictment was explained at the

12   beginning of the case.

13           MR. KAKKAR:  Right.  But the displaying of the

14   indictment.

15           MR. LARSON:  Your Honor, these are the Government's

16   charges.  I'd like to show them -- walk them through.

17           THE COURT:  Overruled.

18   BY MR. LARSON:

19   Q.   All right.  So do you see, then, the screen in front of

20   you?

21   A.   Yes, I do.

22   Q.   You see it's Count 3, 18 USC Section 1349.

23   A.   Yes.

24   Q.   That's conspiracy to commit wire fraud; you know that?

25   A.   Correct.

1    Q.   You see the allegations against Mr. Herrera and Mr.

2    Whittington where they conspire, correct?

3    A.   Yes.

4    Q.   All right.  I'm going to go down to the overt acts.  And

5    there's three of them.  You see the three overt acts there?

6    A.   Yes.  Yes.

7    Q.   The first overt act is that *On or about January 5th, 2011,*

8    *co-conspirator and the defendan*t, that's Mr. Herrera, *met with*

9    *victim R.S.* -- now, the jury I think has heard R.S. is Richard

10   Scislowski.  You know that as well, right?

11   A.   That's correct.

12   Q.   -- *met with victim R.S. during which meeting defendant*

13   *Herrera displayed a law enforcement badge to victim R.S., and*

14   *co-conspirator Whittington and defendant Herrera induced R.S.*

15   *to believe defendant Herrera was a then-active law enforcement*

16   *officer and affirmed that they would help victim R.S. with*

17   *victim M.S.'s immigration issues.*  M.S. is Richard's wife,

18   right?

19   A.   That's correct.

20   Q.   This is that dinner party that we've heard so much about?

21   Eva Reber, the defendant, Mr. Whittington, and the Scislowskis

22   were all together at dinner?

23   A.   That's correct.

24   Q.   You're familiar with this because -- from being an

25   assistant or assisting in this investigation?

1    A.    That's correct.

2    Q.    All right.  That's January 5th of 2011.

3          Then the next overt act is January 7th of 2011,

4    *Co-Conspirator Whittington received a wire transfer in the*

5    *amount of $5,500 from victim R.S.'s Bank of America account*

6    *into co-conspirator Whittington's Bank of America account.*

7    A.    Yes.

8    Q.    That's the transfer we saw on Exhibit 9-A?

9    A.    That's correct.

10   Q.    The third final overt act, *On or about January 13th*

11   *co-conspirator Whittington received a wire transfer in the*

12   *amount of 3,000 from victim R.S.'s bank account into*

13   *co-conspirator Whittington's bank account*.  And that's the

14   other transaction, correct?

15   A.    Correct.

16   Q.    So following the conspiracy count, then, there are --

17   there are four substantive counts of wire fraud in this

18   indictment, correct?

19   A.    You'd have to show them to me.  Let's go over them.

20   Q.    Okay.  Let's look at the transactions first.  Let's do

21   this in the same manner that we just did.  I'm going to put

22   back on the screen page 146819.  The jury already saw this.

23   And these are the four transactions that you testified about,

24   correct, the ones on January 7th?  They all took place on

25   January 7th.  That was your testimony, right?

```
 1    A.   That's correct.
 2    Q.   The first one is the cash withdrawal for $60.  The second
 3    is the purchase on January 7th at the Ralph's in La Quinta,
 4    correct?
 5    A.   Correct.
 6    Q.   And the third is the purchase on January 7th from the
 7    Ralph's in Indio, correct?
 8    A.   Yes.
 9    Q.   Are you familiar with -- Ralph's in Indio and La Quinta,
10    that's the Ralph's grocery store?
11    A.   Yes.
12    Q.   There's one in La Quinta.  There's one in Indio.  There's
13    one in Palm Springs.  There's a lot of Ralph's out in the
14    desert?
15    A.   I know of at least 2 or 3.
16    Q.   I'm asking you based on you having lived out there for
17    eight years?
18    A.   Right.
19    Q.   And then there's this credit card purchase down at the
20    Disney Resort, Disney Anaheim.  You see that?
21    A.   Yes.
22    Q.   Okay.  So now I'm going to switch over to the indictment.
23    I'm just going to show you Counts 4, 5, 6, and 7.
24         I need to do it this way.  I need to show you a
25    previous page.  All right.  So I've got to cover up one number
```

1  here because there's no Count 8 anymore.

2          You see Counts 4 through 7, I'll proffer for you, are

3  violations of 18 USC Section 1343 and 2(a), right?

4  A.   Yes

5  Q.   And you know Section 1343 and 2(a) is aiding and abetting

6  wire fraud?

7  A.   Yes.

8  Q.   Is that correct?

9  A.   That's correct.

10 Q.   And, in fact, the use of interstate wire communications.

11 This is -- these are just allegations, right?  The judge has

12 instructed that allegations are not evidence of anything.  It's

13 simply what the Government is alleging.  You agree with that?

14 A.   That the indictment is just allegations?

15 Q.   The indictment is not evidence; it's just an allegation.

16 A.   Yeah.  It's a formal charging document, yeah.

17 Q.   It doesn't prove anything by itself, correct?

18 A.   No.

19 Q.   You know that from being an FBI agent and hearing many

20 times the judge give that instruction?

21 A.   Right.

22 Q.   It says, *On or about the date set forth below in Riverside*

23 *County within the Central District of California, and*

24 *elsewhere, the defendant Mr. Herrera and the co-schemer*

25 *Whittington, for the purpose of executing and attempting to*

1   *execute the above-described scheme to defraud, transmitted and*

2   *caused the transmission of, and aided and abetted the*

3   *transmission of the following items by means of wire*

4   *communications in interstate and foreign commerce.*  You see

5   that?

6   A.   I do.

7   Q.   And that's -- that's the actual -- those are the four

8   substantive wire fraud charges against my client, correct?

9   A.   Yes.

10  Q.   And these line up with the bank account that you just

11  introduced -- you just talked about in 9-A.  So Count 4 is

12  January 7th.  It's the ATM withdrawal.  Count 5 is January 7th.

13  It's the debit card transaction.  Count 6, January 7th, is the

14  next debit card transaction.  And Count 7 is the fourth.  Take

15  a moment to take a look at the exhibit to make sure these four

16  transactions are the same four transactions in the exhibit.

17        MR. KAKKAR:  Objection, your Honor.  Sidebar.

18        THE COURT:  Very well.

19        (Outside The Presence Of The Jury:)

20        MR. KAKKAR:  Your Honor, the Government believes that

21  the testimony is going in a direction of calling for legal

22  conclusion.  It's improper argument and improper -- attempt at

23  --

24        MR. LARSON:  It's going in a bad way for the

25  Government, but there's going to be no legal conclusion.  I am

1   going to demonstrate that the dates are wrong.

2           MR. KAKKAR:  Your Honor, that would be --

3           MR. LARSON:  This is critical.

4           MR. KAKKAR:  -- legal --

5           MR. LARSON:  It's not a legal argument.  It's a

6   factual argument.  He misread the bank statements.  I'd like to

7   continue with my cross-examination on that point.

8           THE COURT:  Okay.  Overruled.

9           (In the Presence of the Jury:)

10  BY MR. LARSON:

11  Q.   So let's begin with the Count 7.  Now, in the indictment,

12  and in your testimony before the jury, you said that took place

13  on January 7th, correct?

14  A.   That was the posting date at the bank account.

15  Q.   That's the posting date, but that's not what you said.

16  You were asked by this Assistant U.S. Attorney when did that

17  take place, and you said January 7th, correct?

18          MR. KAKKAR:  Objection, your Honor.  Misstating

19  testimony.

20          THE COURT:  Overruled.

21  BY MR. LARSON:

22  Q.   Again, you were asked -- and they went down 1, 2, 3, 4.

23  You were asked what date did that take place, and you said

24  January 7th, correct?

25  A.   Right.  I was -- I was going off the date that.

1   Q.   That's a yes-or-no question, Agent Hunter.

2   A.   Could you repeat it?

3   Q.   You were asked by the AUSA -- you went down 1, 2, 3, 4 --

4   four dates, and you were asked what date it took place, and he

5   asked you whether it was January 7th, and you indicated that it

6   was, correct?

7   A.   I did.  That's correct.

8   Q.   It wasn't January 7th that the transaction actually took

9   place on; it was January 5th, correct?

10  A.   According to the statement here, it says the purchase

11  occurred on the 5th.

12  Q.   Let's look at that statement a little more carefully.

13  What it says, it has January 7th in the column to the left.

14  That's what the AUSA pointed out to you.  But if you read it,

15  it says the check card purchase on what date?

16  A.   January 5th.

17  Q.   At the Disney Resort, Anaheim, California, correct?

18  A.   Correct.

19  Q.   So this transaction took place before the wire transaction

20  from the Scislowskis on January 7th, correct?

21        MR. KAKKAR:  Objection.  Speculation.  He can only

22  speak to the document.

23        THE COURT:  Overruled.

24  BY MR. LARSON:

25  Q.   You were called to conduct an analysis of these bank

1    records.  You were put up as a special agent of the FBI for 20

2    some years.  You now work for OIG TARP.  You can read a bank

3    record, can't you?

4    A.    Sure.

5    Q.    All right.  This indicates that the sale took place on

6    January 5th, not on January 7th, correct?

7    A.    That is correct.

8    Q.    Now, looking at the other transactions, do you have any

9    idea what the purchase at the Ralph's grocery store in Indio,

10   California, had to do with the -- with furthering the scheme to

11   defraud?

12   A.    I do not.

13   Q.    Do you know -- have any idea what the purchase for $108.38

14   at the Ralph's grocery store in La Quinta, California, had to

15   do with furthering the scheme to defraud?

16   A.    I do not.

17   Q.    It goes on saying that the cash withdrawal for $60 from an

18   ATM machine.  I assume that's three $20 bills.  You do not know

19   how that money was used in any way, do you?

20   A.    I do not.

21   Q.    And this all happened on January 7th.  You don't know when

22   during the day the wire transfer came in, do you?

23   A.    Um, which wire are you talking about?

24   Q.    There were two wire transfers that you testified about,

25   sir, one on January 7th and one on January 13th, correct?

1   A.   Correct.  Oh, the 5,000 and the 3,000 one?

2   Q.   Right.

3   A.   Right.

4   Q.   Okay.  The one on January 13th, certainly, came in after

5   January 7th.  I assume that's self-evident, right?

6   A.   Right.

7   Q.   But the one that came in on January 7th, we don't know

8   what time of day that came in, do we?

9   A.   Only what's stated on the statement.

10  Q.   That's not stated on the statement, is it?

11  A.   No, it's not.

12  Q.   So it is possible that all of these transactions, not just

13  the one at Disneyland on January 5th, took place before any of

14  these funds came in to the bank from the Scislowskis, correct?

15  A.   Repeat that again.

16  Q.   I said it is possible that all of these transactions, the

17  four that are the wire fraud counts, could have taken place --

18  we know the January 5th one, Disneyland, was before

19  January 7th.  It could have been that all four took place prior

20  to the two transfers?

21  A.   It's possible.

22  Q.   It's possible.

23       Now let's talk about the phone records.

24  A.   Can you give me the exhibit number?

25  Q.   Yes.  I believe the phone records start on Exhibit 11.

1   A.   Thank you.

2          THE COURT:  Counsel let's take our morning recess at

3   this time.

4          Ladies and gentlemen, we'll take a short recess.

5   Please remember my admonitions to you not to discuss this case

6   with anybody, including amongst yourselves.  Do no allow

7   anybody else discuss this case with you.  Keep an open mind

8   about the issues in this case, and do not in any way try to

9   learn about this case.  We'll be back in ten minutes.

10          (Outside The Presence Of The Jury:)

11          THE COURT:  Agent Hunter, you are still under oath.

12   You understand that?

13          THE WITNESS:  Yes, I do, your Honor.

14          THE COURT:  You may proceed.

15          MR. LARSON:  Thank you, your Honor.

16   BY MR. LARSON:

17   Q.   Special Agent Hunter, I do have one last question on

18   Exhibit 9-A on page 146819.

19   A.   Did you say 649?

20   Q.   146819.  It's the page with the four transactions, the

21   wire fraud counts.

22   A.   Okay.  I've got that in front of me.

23   Q.   It's on the screen as well.

24          I just want to look -- address your attention, first,

25   to the January 7th ATM withdrawal.  Just to be clear, based on

1    the record, it appears that transaction was a withdrawal from

2    an ATM machine, correct?

3    A.    That's what it appears to be, the statement reflects.

4    Q.    Looking at the next two entries, the purchase on

5    January 7th from a Ralph's in La Quinta, California, and the

6    purchase on January 7th from a Ralph's in Indio, California,

7    those appear to be point of sale transactions with a merchant,

8    the merchant being Ralph's; is that correct?

9    A.    That is correct.

10   Q.    And then, finally, the check card purchase was a -- well,

11   what it was, it was a check card purchase down at Disneyland,

12   Disney Resort, someplace down there?

13   A.    Yeah.  The one on January 7th?

14   Q.    Yes.  Is that correct?

15   A.    Yeah, it appears to be a check card.

16   Q.    Okay.  Then I assume this is self-evident to everybody,

17   but the Disney Resorts are down in Anaheim, California,

18   correct?

19   A.    That is correct.

20   Q.    Okay.  Let's go to the phone records.  That's Exhibit 11.

21   There's a disk here that was referred to with a lot of phone

22   records on them, correct?

23   A.    Correct.

24   Q.    You haven't reviewed all of those phone records in detail,

25   have you?

1   A.   No, I have not.

2   Q.   I mean, is it fair to say there are thousands of pages of

3   phone records on this disk?

4   A.   Yes.

5   Q.   You were directed in Exhibit 11-A to a particular page of

6   a phone record, correct?

7   A.   That is correct.

8   Q.   Who directed you to that page?  I'm not talking about here

9   in the courtroom.  When you were asked to testify today, who

10   asked you to focus on that page?

11   A.   In my discussions with the FBI and --

12   Q.   Who at the FBI?

13   A.   Well, with Agent Otis and -- yeah.

14   Q.   It was Agent Otis, right?

15   A.   Right.

16   Q.   She told you just to look at this particular page,

17   correct?

18   A.   She didn't say just to look at this page.  She pointed out

19   to me the specific calls that were on there, but the disk, as a

20   whole, I did a -- summary check on the disk and looked through

21   the bank -- I mean, the phone records.  I didn't just look at

22   this page.

23   Q.   Okay.  Well, let's just -- this bill here, 11-A, it's for

24   the month of -- well, what month is it for?  May?  May of what

25   year?

1    A.    It's May.  And the year here that we're talking about is

2    2009.

3    Q.    Okay.  And the two that you testified about are here at

4    the bottom of the page, correct?

5    A.    Yes.

6    Q.    Okay.  And at the top of the page here in the corner it

7    shows a page number, correct?

8    A.    Correct.

9    Q.    So this is page 33 of 59, correct?

10   A.    That is correct.

11   Q.    So just for the month of May this phone had 59 pages of

12   phone calls?

13   A.    Correct.

14   Q.    Did you review all 59 pages of phone calls?

15   A.    I did not.

16   Q.    So even just for this one month you were directed to these

17   two significant --

18   A.    I did.  I -- I read through the bill for that month and

19   the preceding month and the one after, but I -- I mean, I

20   didn't review it line by line, no.

21   Q.    Okay.  Just, kind of, skimmed through it?

22   A.    Uh-huh.

23   Q.    Looking for any particular number?

24   A.    Ah, yeah.  Looking for any particular number or

25   destination or length of a call, something that would jump out

1    at me.

2    Q.   Which numbers were you looking for?

3    A.   One of them would be the cell phone number that belongs to

4    David Herrera.

5    Q.   Okay.  And you found -- you found these two entries?

6    A.   Yeah.

7    Q.   Okay.  You mentioned the length of the call.  That's

8    indicated in a column that says *Minutes*, right?  There's a

9    column that says *Minutes*, right?

10   A.   Right.

11   Q.   And what are the minutes for the two calls that you just

12   testified about?

13   A.   One minute.

14   Q.   I'm sorry?

15   A.   One minute.

16   Q.   Okay.  And a one minute -- one minute is, kind of, the

17   minimum number of minutes that's shown, correct?

18   A.   That I'm not sure about.

19   Q.   Have you found any other page -- I know you haven't looked

20   at all of them.  And if you would like to look through, we can

21   certainly make that available to you, but is there any page in

22   any of these thousands of pages that you saw in your review

23   that had anything listed for less than one minute?

24   A.   I haven't seen a smaller time increment.

25   Q.   I'm just asking for the ones that you have seen, have you

1    ever seen a less than a one-minute entry?

2    A.    Not on these Verizon records, no.

3    Q.    Think it's fair to assume that one minute is the minimum

4    minutes that are posted for a phone call?

5    A.    Yeah.  It's the smallest amount -- I mean, the shortest

6    time period that I've seen.

7    Q.    Okay.  Even if the call is a hang up, it will post one

8    minute, right?

9    A.    That I don't know.

10   Q.    Do you have any expertise in evaluating telephone records?

11   A.    Um, what do you mean by -- you mean have I looked at them

12   before?  What do you mean by *expertise*?

13   Q.    Instead of the case agent, they put you up to testify

14   about these phone records.  I assume you have some expertise in

15   this area?

16   A.    Yeah.  I have expertise in that I've reviewed phone

17   records over my career.  I understand how to read them, if

18   that's what you mean.

19   Q.    Weren't you just put on the stand so the case agent didn't

20   have to get up on the stand?

21             MR. KAKKAR:  Objection, your Honor.  Foundation.

22             THE COURT:  Sustained.

23             THE WITNESS:  Repeat that.  Was I put on the stand

24   because of why?

25   BY MR. LARSON:

1   Q.   You were put on the stand so the case agent would not have

2   to get on the stand?

3             THE COURT:   The objection is sustained.

4             MR. LARSON:   I'm sorry, your Honor.   My mistake.

5   BY MR. LARSON:

6   Q.   So you don't know whether a hang up call or a quickly hung

7   up call registers as a minute or doesn't register as a minute?

8   A.   I do not know that.

9   Q.   All right.   I'll leave that alone?

10            And this is all we have?   This is all you've

11  testified about are those two calls here, correct.

12            THE WITNESS:   That's correct.

13  BY MR. LARSON:

14  Q.   Have you looked for any three-way calls?

15  A.   No.   I have not looked for three-way calls.

16  Q.   Just to be clear, we have a disk here which has all the

17  records, right?

18  A.   That's correct.

19  Q.   And even though this says Kathy Moore, Kathleen E. Moore,

20  you understand that this, really, is a phone being used by

21  Jerry Whittington, correct?

22  A.   Yes.

23  Q.   And you know that how?   Because Special Agent Otis told

24  you so?

25  A.   That and through other investigation, interviews,

```
1    interviews that we've done with various people.

2    Q.   Other people have told you that?

3    A.   Yeah, other witnesses.

4    Q.   All right.  You do you know who Kathleen Moore is?

5    A.   Yes.

6    Q.   All right.  So the next thing you testified to was the

7    Merlin search database.  That's Exhibit 14.  Could you turn to

8    that exhibit?

9    A.   Sure.

10   Q.   Now, you were asked as a foundational question if you were

11   familiar with this Merlin search database, and you said you

12   were, correct?

13   A.   That's correct.

14   Q.   I believe you said that this is a database that is

15   commonly used by private investigators, correct?

16   A.   That's my understanding.

17   Q.   So private investigators, when they're asked to do a

18   records check or check on property or hired to do anything like

19   that, this is one of the databases that they can pay a fee for,

20   get a license and use, correct?

21   A.   That's correct.

22   Q.   There's nothing illegal about using a Merlin Power Search

23   Log database, correct?

24   A.   No.

25   Q.   In fact, it's very common, I think you said?
```

1    A.    Correct.

2    Q.    You know a lot of -- I mean, I know you're still an active

3    agent, but you know agents who have gone on after they retired

4    and become investigators, don't you?

5    A.    Yes, I do.

6    Q.    In fact, quite a few agents go on and become

7    investigators?

8    A.    It's -- it's fairly common, yeah.

9    Q.    In fact, some very famous FBI agents have become

10   investigators, haven't they?

11   A.    Famous?  I'm not sure what you mean by famous FBI.

12   Q.    You know Louie Freeh, right?

13   A.    I've met him a couple times.  The former director of the

14   FBI.  I met him a couple times.

15   Q.    He was the director back in the Clinton years and first

16   year of Bush?

17   A.    Mid '90s.

18   Q.    He's got a very prestigious investigative service?

19   A.    That's my understanding.  I haven't had any personal

20   contact with him.

21   Q.    I'm not suggesting that.  You know there's nothing wrong?

22   A.    Yeah.

23   Q.    And Mr. Freeh, have you ever seen his website?

24   A.    No, I have not.

25   Q.    You know that many former FBI agents or former federal

1   agents will describe themselves as a former agent when they are

2   talking trying to get clients?

3   A.   Yeah.   They'll refer to their past employment, sure.

4   Q.   In fact, for all of us our previous employment's pretty

5   important, isn't it?

6   A.   Yes.

7   Q.   As a credential?

8   A.   Yes.

9   Q.   Okay.  And there's nothing wrong with that, is there?

10  A.   No.

11  Q.   Okay.  Well, back to this Merlin Power Search Log.  On the

12  first page -- I think this was put up for you -- there's a --

13  this is Mr. Herrera, I think you testified, because there's a

14  user ID that says *HerreraINV*, which I'm guessing means Herrera

15  Investigations or something like that?  Is that your assumption

16  as well?

17  A.   That's my assumption.

18  Q.   Well let's assume that.  And assume that these client

19  references AFG, AFG, AC, and they go on, these refer to other

20  clients, correct?

21  A.   Again, that would be my assumption, yeah.

22  Q.   We're just assuming this because you never -- you never

23  looked into -- did you interview any of these other clients of

24  Mr. Herrera?

25  A.   No, I did not.

1  Q.   But you have no reason to believe that these aren't

2  legitimate clients that hired him to do a Merlin Power Search

3  for whatever it is?

4  A.   Yeah.  I have no information one way or another on that.

5  Q.   And this goes on for 23 pages, correct?  Take a look at

6  the exhibit there.

7  A.   I see the last one was 23 of 23.

8  Q.   All right.  So this is from -- for a period of time from

9  -- if I'm reading it right on the first page, it's from

10  2009-2-16 -- I'm gathering that's February 16, 2009.

11  A.   That looks correct.

12  Q.   Is that how you'd interpret that?

13  A.   Uh-huh.  Yes.

14  Q.   Through January 3rd of 2010, correct?

15  A.   Correct.

16  Q.   So that's a -- what is that?  That's a ten-month period

17  about?

18  A.   Yeah.  Roughly.

19  Q.   So in the ten months Mr. Herrera had all these clients,

20  right?  There's page after page of them.  They each have their

21  initials, *TJM, HC, HIS*.  We can, kind of, skip through the

22  pages here, *MIS, CRJ*.  We don't know who these are, but we

23  assume these are different clients, correct?

24  A.   That's correct.

25  Q.   So you were just focused on -- by the Assistant U.S.

1    Attorney on page 7 where we have the four entries that have JW,

2    and we're assuming, again, that that's Jerry Whittington,

3    right?

4    A.    That's correct.

5    Q.    The initials line up?

6    A.    Yes.

7    Q.    Do you know for a fact that's Jerry Whittington?

8    A.    No.  Only assuming it.

9    Q.    We're just assuming, okay.

10              Well, it's for the Pacific Property Assets.  And

11   there was -- there were the four -- the power entries there.

12   And I think you've indicated that this is something that

13   private investigators commonly get hired to do, correct?

14   A.    That's correct.

15   Q.    Are you aware that there was a lawsuit involving Carl

16   Vienna suing Pacific Property Assets?  You're aware of that

17   lawsuit, correct?

18   A.    I know that there was some efforts made to get him back

19   some money that he lost.  I can't say that I know specifically

20   about a lawsuit.

21   Q.    So you've been involved in this investigation and you

22   haven't heard about the lawsuit down in Orange County between

23   Carl Vienna and PPA?

24   A.    No.  It's not ringing a bell.

25   Q.    You know, the jury has seen some court records that were

1    introduced.  If you saw those, would that refresh your

2    recollection?

3    A.   Yes.  Sure.

4          MR. LARSON:  Your Honor, if I can have a minute, I

5    have to figure out what that exhibit number is.

6          THE COURT:  You may.

7          MR. LARSON:  To be accurate, Mr. Behnke has to figure

8    out what exhibit number that is.

9    Q.   Why don't we come back to that.

10   A.   Do you want me to put away the Merlin records?

11   Q.   I think we're done with the Merlin records.

12         Here.  We have it here.  This is Government's Exhibit

13   No. 441.

14         MR. KAKKAR:  Your Honor, I believe it's Defense

15   Exhibit.

16         MR. LARSON:  I'm sorry.  It's -- it's a defense

17   exhibit.  It's Defense Exhibit 441.

18         THE COURT:  Is it received into evidence?

19         MR. LARSON:  This has been previously admitted into

20   evidence.

21         THE COURT:  You may publish.

22   BY MR. LARSON:

23   Q.   Do you see the entry there, the case name is Vienna vs. PP

24   Holdings?

25   A.   I do.

1   Q.   The attorney is Kerry Kinney?

2   A.   I see that.

3   Q.   All right.  Does this help refresh your recollection as to

4   whether or not Mr. Vienna was involved in a lawsuit with PPA

5   Holdings that's related to this case?

6   A.   It does.  I've never seen this document before.  I

7   recognize the attorney's name, Kinney.

8   Q.   Very good.  I'm not actually asking you to recognize the

9   document.  I'm just using it to refresh your recollection.  So

10  I'm glad that it does.

11        What do you remember about Mr. Kinney?

12  A.   Mr. Kinney was retained by Jerry Whittington, I think, to

13  help recover some of the lost money with PPA.

14  Q.   And he was retained to file a lawsuit against Pacific

15  Property Assets, correct?

16  A.   Yes.

17  Q.   And there was, in fact, a lawsuit filed, correct?

18  A.   I'm getting that off of the document that you put in front

19  of me.

20  Q.   And it appears -- and I know we're making assumptions here

21  because we don't know who did anything here, but the assumption

22  is that the Merlin Power Search for Pacific Property Assets by

23  Herrera Investigations for JW in March of ',09 that's probably

24  connected to this lawsuit; is that a fair assumption?

25        MR. KAKKAR:  Objection, your Honor.  Foundation.  It

```
 1   should be May 2009.
 2            THE COURT:  Do you want to rephrase?  Rephrase.
 3   BY MR. LARSON:
 4   Q.   The lawsuit was in 2009.
 5            I'm sorry, I said March.  I have a bit of a cold,
 6   your Honor.  I meant May of 2009, not March.  I misspoke.
 7            You understand the question, Mr. Hunter?
 8   A.   I do.
 9   Q.   Would you answer it, please?
10            MR. KAKKAR:  Objection.  Calls for speculation.
11            THE COURT:  Overruled.  If you know.
12            THE WITNESS:  So this document here is showing the
13   lawsuit was filed May 22nd, 2009.  And the searches are dated
14   May 13th, 2009.
15   BY MR. LARSON:
16   Q.   So would it be unreasonable for a lawyer or a team that's
17   trying to sue somebody to do some investigative work before
18   filing the lawsuit to get exhibits or documents or information
19   before filing -- right before filing a lawsuit?
20            MR. KAKKAR:  Objection.  Calls for speculation.
21            THE COURT:  Sustained.
22   BY MR. LARSON:
23   Q.   You conduct investigations before you file your lawsuits
24   in -- or have the prosecutors file your lawsuits, don't you?
25   A.   I've never had a prosecutor file a lawsuit.
```

1  Q.   Well, I know it doesn't seem like a lawsuit, but,

2  actually, a prosecution is a form of a lawsuit.  It's United

3  States vs. David Herrera.  It's a prosecution.

4  A.   Okay.

5  Q.   Before a prosecution, before a claim, before a --

6  A.   Like formal charges?

7  Q.   Before a charge is filed, you do an investigation, right?

8  A.   Sure.  Definitely.

9  Q.   So you do the investigation first and then you come in and

10 make your claim in court, right?

11 A.   Yes.

12 Q.   Right?

13      You wouldn't file a charge first and then try to

14 figure out a case?  That would be wrong, wouldn't it?

15      MR. KAKKAR:  Objection, your Honor.  Speculation and

16 relevance.

17      THE COURT:  Overruled.

18      THE WITNESS:  Would it be wrong, you said, to do the

19 investigation after you filed?

20 BY MR. LARSON:

21 Q.   Right.  If you charged somebody with something or filed a

22 lawsuit and hadn't done your investigation, that would be

23 irresponsible?

24 A.   That wouldn't be the prudent way to do it, no.

25 Q.   All right.  Let's go to the next area is --

1    A.    Are we through with this binder?

2    Q.    Well, we're done with that exhibit.

3    A.    Okay.

4    Q.    I don't know if we're done with the binder.

5          Let's go to the Bureau of Prisons records.  I think

6    we started with Exhibit 26.  I don't know if that's in that

7    binder or another binder.

8    A.    I've got it.

9    Q.    So Exhibit 26 is another one of these big disks with a

10   whole bunch of information on it, correct?

11   A.    Yes.

12   Q.    Is it fair to say that you did the same kind of review on

13   this disk you did with the other disks?

14   A.    Yes.

15   Q.    Summary review?

16   A.    Yes.

17   Q.    Special Agent Otis, kind of, told you what to look for?

18   A.    Yes.

19   Q.    All right.  The exhibits that the Government put before

20   you -- I think there were three of them.  The first one was

21   Exhibit 16.  So let's turn to that.  Do you have that in front

22   of you?

23   A.    I do.

24   Q.    I think you testified this is a Bureau of Prisons record;

25   is that correct?

1    A.    That is correct.

2    Q.    You were asked to read the first half of the first

3    sentence.  Why don't you read the whole sentence under number

4    4.

5    A.    Okay.  *Inmate Whittington arrived at Taft Correctional*

6    *Institution on February 15th, 2005.  He is currently serving*

7    *120-month sentence for wire fraud.*

8    Q.    Okay.  And you see at the bottom there that this document

9    was actually prepared by a case manager?  You see that there in

10   the bottom?

11   A.    Yeah, N.  Gonzalez.

12   Q.    And the unit manager signed off on it as well, J.

13   Strongin?

14   A.    Did somebody sign for him?

15   Q.    It looks like somebody may have signed for him.

16   A.    Yeah.

17   Q.    My whole point is I don't know either of these people, but

18   these are probably officials at the Bureau of Prisons that

19   actually signed off and prepared this document?

20   A.    That appears to be so.

21   Q.    So the information in it is information that the Bureau of

22   Prisons had about, in this case, Jerry Whittington, correct?

23   A.    That's correct.

24   Q.    Now, let's look at Exhibit 17.  This is also a Bureau of

25   Prisons form, correct?

1    A.    Correct.

2    Q.    And this was put before you to point out that Mr.

3    Whittington listed David Herrera Investigations as his employer

4    upon release, correct?

5    A.    That is correct.

6    Q.    What -- explain your understanding of what this form -- I

7    mean, it says *Supervision Release Plan* at the top.  Are you

8    familiar with what a supervision release plan is?

9    A.    No, I'm not.

10   Q.    You don't know?

11   A.    Huh-uh.

12   Q.    Why are you testifying about this?

13   A.    I'm testifying that this document was contained within the

14   grand jury subpenaed records by the FBI.

15   Q.    But you don't know anything about how this document is

16   formed, created?

17   A.    No, I do not.

18   Q.    You don't know what it's used for?

19   A.    No, I do not.

20   Q.    Is it possible that this is just the name that Mr.

21   Whittington gave that he said he was going to be employed by

22   after he got out?

23   A.    Again, I don't know anything about that as far as --

24   Q.    But it's possible?

25   A.    It's possible.

1  Q.   In fact, it's signed by Jerry Whittington, or at least

2  purportedly signed by Jerry Whittington, correct?

3  A.   That's correct.

4  Q.   So you don't know whether or not, in fact -- well, you

5  didn't investigate as to whether or not Mr. Whittington went to

6  work for Mr. Herrera after he got out, did you?

7  A.   Um, no.  That -- we looked --

8  Q.   It's a yes-or-no question.

9  A.   Repeat it again.

10 Q.   In fact, isn't it true that Mr. Whittington actually was

11 employed by Desert Pharmacy Partners after he was released from

12 this prison sentence?

13 A.   That's true.

14 Q.   So he didn't work for Mr. Herrera after he was released

15 from prison.  That was not his employment, correct?

16 A.   That's correct.

17 Q.   That's just what was put on a form, correct?

18 A.   Yeah.  My understanding is that somebody within BOP

19 declined -- he couldn't get a job -- being a convicted felon,

20 he couldn't go to work for a PI.

21 Q.   You don't know where that information comes from?  That

22 could have come from Mr. Whittington, right?

23 A.   No.  That -- it seems like to me that we talked to

24 somebody at BOP that gave us that information.

25 Q.   You just told this jury, Mr. Hunter, that you didn't know

1  anything about the form, and now you're saying it seems to you

2  that they talked to somebody?

3  A.   No.  There was investigation done by the FBI.  There was

4  follow-up.  And I -- I remember there being something about

5  some Bureau of Prisons official or somebody declining -- you

6  know, you can't go to work, declining Mr. Whittington to go to

7  work there.

8  Q.   But my point is who was the one that was suggesting that

9  he was going to go to work there?  It was Mr. Whittington,

10  right?

11  A.   I don't know whose idea it was.  I don't know.

12  Q.   And he didn't go to work there, correct?

13  A.   He did not.

14  Q.   So was this, kind of, a form of a request by Mr.

15  Whittington, or you don't know what this was?

16  A.   Yeah, I don't -- I don't know the underlying facts

17  regarding this form.

18  Q.   Very well.  We'll move on.

19        Now, finally, Exhibit 31, which was the last exhibit

20  that you were shown, I believe, is a judgment in a criminal

21  case.  You have that before you?

22  A.   Yes, I do.

23  Q.   And it shows a judgment October 31st, 2000, correct?

24  A.   Yes, it does.

25  Q.   And the AUSA asked you how much time he received on this

1    judgment, correct?

2    A.   That's correct.

3    Q.   And you said 120 months?

4    A.   Yes, I did.

5    Q.   And he did that to try to suggest that he was in federal

6    custody for the next five years or 85 percent of it, correct?

7              MR. KAKKAR:  Objection.  Speculation.

8              THE COURT:  Sustained.

9    BY MR. LARSON:

10   Q.   Do you know why he asked you about that?

11             MR. KAKKAR:  Objection, your Honor.  Speculation.

12             THE COURT:  Overruled.

13             THE WITNESS:  My understanding he was asking me to

14   show that Jerry Whittington was sentenced to a pretty long

15   prison term, 120 months.

16   BY MR. LARSON:

17   Q.   That he was -- I'm sorry?

18   A.   That Jerry Whittington was sentenced to a long prison

19   term, 120 months.

20   Q.   That's your understanding?

21   A.   That's my understanding.

22   Q.   I'd ask you to turn to Defendant's Exhibit 467.

23             And your Honor this has not been admitted.  This is

24   only for the witness to see.

25             THE COURT:  Very well.

```
1                    (Exhibit 467 identified.)
2               THE WITNESS:  I've got it in front of me, Counselor.
3               MR. LARSON:  So, your Honor, I would proffer that
4   even though the copy the witness has does not have the
5   certification, it's a certified document that's been submitted
6   to the court.
7   Q.   You recognize this document, sir?  Or can you identify
8   what this document is?
9   A.   I don't think I've ever seen this document before.
10  Q.   I'm not asking whether you've seen this particular
11  document.  Are you familiar with this type of document?  It's a
12  printout from the superior court, Riverside.
13  A.   No.  I mean, is this something you would go into the
14  court's website and get, like off of Pacer or something?  Is
15  this where this would come from.
16  Q.   It's from the riversidecourts.ca.gov.  See the website up
17  there?
18  A.   Yeah, I see it.  I can't say that I'm -- the information
19  on here looks familiar, that I've seen in other cases of mine,
20  but it seems like it's coming in a little different format.
21  Q.   I'm going to proffer for you that this is a certified copy
22  of a Superior Court, Desert Courts, Riverside County caseprint.
23  And we have submitted a certified copy, a self-authenticating
24  certified copy to the court.  Do you have any reason to doubt
25  that, sir?
```

1   A.   No, I do not.

2   Q.   And there's a lot of data on here.  I just want to point

3   out a few things.

4            Your Honor, based on this, I'd move to admit

5   Exhibit 473 in evidence.

6            MR. KAKKAR:  Objection, your Honor.

7            MR. LARSON:  467, I'm sorry.  Admit 467 into

8   evidence.

9            MR. KAKKAR:  Objection.  Foundation.

10           THE COURT:  Overruled.

11           (Exhibit 467 admitted.)

12            MR. LARSON:  I'd ask this to be published at this

13   time.

14           THE COURT:  You may.

15   BY MR. LARSON:

16   Q.   See here the first point I've highlighted the date filed

17   was April 3rd, 2003?

18   A.   Yes, I see that.

19   Q.   And the district attorney is Robert Spira, S-p-i-r-a.  You

20   see that?

21   A.   I do.

22   Q.   Right below it the defense attorney is J. Hemmer?

23   A.   Yes, I see that.

24   Q.   Custody status is what?

25   A.   In custody.

1    Q.   Can I ask you to turn to the last page, page 16?

2         Oh, I'm sorry.  I'm sorry.  I hate to do this, go

3    back to the first page.  The charges -- I guess I haven't

4    established that this is Mr. Whittington.  You see the name of

5    the defendant at the top?  I'll highlight it here.

6    A.   I do, yes.

7    Q.   That's Jerry Arthur Whittington.  And you see the offenses

8    that he's charged with, embezzlement, grand theft, numerous

9    counts of grand theft, taking or damage or destroying property.

10   You see all that?

11   A.   I do.

12   Q.   Now I'd ask you to turn to page 16.  And this is reporting

13   -- actually, you may want to look at the page before this.  It

14   will have the date of -- these are entries for June 27th, 2003,

15   correct?  If you look at the date the page before, page 15.

16   A.   Right.

17   Q.   You see that?

18   A.   I see down at the bottom it starts at June 2003, goes up

19   to July 2000.

20   Q.   Right.  This is in reverse order.  So this is going

21   forward.  All right.

22        So let's turn to page 16.  So the very first entry,

23   then, is April 3rd, 2003.  And this whole document goes in

24   reverse chronological order, correct?

25   A.   It appears to, yes.

1   Q.   All right.  So after the first few entries there's an

2   entry on June 13th, 2003, which says *Agreement on Detainers*

3   *Filed*, correct?

4   A.   Yes.

5   Q.   Do you know what an agreement on detainers is based on

6   your experience in law enforcement?

7   A.   Well -- again, this is a state document, right?  This is

8   state.  That's why I'm no.

9   Q.   It is.

10  A.   That's why I'm not familiar with the format.  Detainers, I

11  would -- it's either going to be -- what we federally refer to

12  some sort of a bond that a person is on or -- I don't know if

13  it would be a detainer for the attorney he's retained.

14  Q.   Sometimes there's -- a single criminal defendant is wanted

15  in the fed system and the state system and different

16  jurisdictions all at the same time.  You've had that

17  experience, correct?

18  A.   I have.

19  Q.   There are detainers placed on him from different

20  jurisdictions, correct?

21  A.   Correct.

22  Q.   And then there sometimes has to be an agreement on who's

23  going to actually get the body for prosecution at a given time,

24  correct?

25  A.   That's correct.

1    Q.   And that is negotiated sometimes between law enforcement

2    agencies, sometimes the court orders.  There's a whole bunch of

3    different ways that can get resolved, correct?

4    A.   That's correct.

5    Q.   You've had a lot of experience with that?

6    A.   Yes.

7    Q.   Now, we're going to look at the entry, the next entry is,

8    as I indicated, on page 15 is this June 27th, 2003, entry,

9    which starts on page 16 because it's going in reverse

10   chronological order; is that correct?

11   A.   That's correct.

12   Q.   Just to show the jury, here's page 15, and at the bottom

13   it says June 27th, 2003.  And that includes this entry here,

14   correct?

15   A.   Yes.

16   Q.   Maybe if I put it this way it, kind of, reads like that,

17   correct?

18   A.   Yes.

19   Q.   So this whole entry is there on June 27th.  I'm going to

20   focus on one line -- actually a couple lines.  *Bail is set in*

21   *the amount of $70,000.*  But we saw on the front page that he

22   was still in custody, correct?

23   A.   That's correct.

24   Q.   *Defendant is ordered to return to be housed at Indio jail*

25   *only remanded to custody of Riverside Sheriff.*  Do you see

1    that?

2    A.    I do.

3    Q.    And you've been out in the Riverside area, Palm Springs

4    area for a while.  You know the Riverside sheriff has a jail

5    out in Indio?

6    A.    Yes, they do.

7    Q.    That's out past Palm Springs?

8    A.    Yes.  East of there, yeah.

9    Q.    East of Palm Springs, okay.

10            Are you aware through the investigation that the

11   first time that the FBI spoke with Mr. Whittington, with Cathy

12   Otis, that he told Cathy Otis that he met Mr. Herrera through

13   John Hemmer?

14            MR. KAKKAR:  Objection, your Honor.  Hearsay.

15            THE COURT:  Sustained.

16   BY MR. LARSON:

17   Q.    Have you reviewed the proffers that Mr. Whittington made?

18   A.    It's been a while.  I can't say that I've looked at them

19   all.

20   Q.    So I'd have to ask Cathy Otis, huh?

21            MR. KAKKAR:  Objection, your Honor.  Lack of

22   foundation.

23            THE COURT:  Sustained.

24   BY MR. LARSON:

25   Q.    Were you involved in the arrest of Mr. Whittington?

1  A.   Yes, I was.

2  Q.   I didn't realize it.  You wrote the FBI 302 report for --

3  or not -- you wrote a report of interview for first proffer

4  session with Mr. Whittington?

5  A.   I did.  That's correct.

6  Q.   That's what I was talking about, sir.  You were present

7  for that meeting?

8  A.   Yeah.  You asked me had I reviewed the *proffers*.  You

9  didn't say was I present during the proffer.

10 Q.   I should have been much more specific.  I'm talking about

11 the first proffer.  The first time you met with Mr.

12 Whittington.  You were present for that first proffer?

13 A.   Yes, I was.

14 Q.   And he told you that he met Mr. Herrera through John

15 Hemmer, correct?

16          MR. KAKKAR:  Objection, your Honor.  Hearsay.

17          THE COURT:  Approach.

18          (Outside The Presence Of The Jury:)

19          THE COURT:  Very well.  Mr. Larson, do you have an

20 exception.

21          MR. LARSON:  I'm not offering this for the truth of

22 the matter asserted, your Honor.

23          THE COURT:  What purpose are you offering it for?

24          MR. LARSON:  I'm offering it for what he told the

25 FBI.

1          THE COURT:  How is that relevant if it's not true?

2          MR. LARSON:  We're trying to establish where he was

3    and that he was -- where he was in 2003, I mean.  Whether he

4    actually met Mr. Whittington through -- that's not -- that's

5    what he told the FBI.  It's -- there's a part I can't get into

6    right now.  There's -- we may have to wait until Monday and

7    recall, your Honor.

8          MR. KAKKAR:  Your Honor, the Government believes this

9    is relying on the truth of the matter asserted because he's

10   using Mr. Whittington's statement that he met John Hemmer at a

11   certain time.  The Government would anticipate that there's

12   other evidence showing where Mr. Hemmer was and what that

13   purpose was.  This is an indirect way of getting Mr.

14   Whittington testifying through Special Agent Hunter.

15         MR. LARSON:  We, certainly, haven't had Mr.

16   Whittington testify in this case.  Your Honor, his testimony

17   has come in from every single witness the Government has

18   called.

19         MR. KAKKAR:  Your Honor, the Government has used

20   those statements for falsity, not for the truth of the matter

21   asserted.  Defense counsel has yet to articulate the nonhearsay

22   purpose.  Why is the effect on the listener -- why is the

23   effect of what Mr. Whittington said to Special Agent Hunter

24   relevant in establishing how Mr. Whittington met Mr. Herrera?

25         MR. LARSON:  The effect on the special agents.

```
 1              THE COURT:  I have to sustain it.  You may have to
 2    recall him.
 3              (In the Presence of the Jury:)
 4    BY MR. LARSON:
 5    Q.   Do you know who John Hemmer is?
 6    A.   I do.
 7    Q.   Tell the jury who John Hemmer is.
 8    A.   He is a retired attorney.  He's currently living in Las
 9    Vegas.  And prior to that, he was an attorney practicing in the
10    Indio, California, area.
11    Q.   And before he was an attorney, what was he -- actually,
12    while he was an attorney, was he also a commissioner?
13    A.   Yes.
14    Q.   What's a commissioner?
15    A.   I'm not sure.  I think he did -- it's, like, a form of a
16    judicial officer, like a judge.
17    Q.   Not quite a superior court judge, but, kind of, like a
18    judge that hears cases?
19    A.   Yes.
20    Q.   Did you interview Mr. Hemmer in this case?
21    A.   I did.
22    Q.   Why did you interview Mr. Hemmer?
23    A.   Um, we were interviewing Mr. Hemmer to establish a
24    timeline.
25    Q.   You were trying to establish a timeline.  Why would you
```

1    pick Mr. Hemmer, former Judge Hemmer of all people, to try to

2    establish a timeline?

3              MR. KAKKAR:  Objection, your Honor.  Relevance.

4              THE COURT:  Overruled.

5              THE WITNESS:  Um, it had come to our attention that

6    Jerry Whittington and -- had retained Hemmer at some point, so

7    we were trying to find, you know, the relationship between the

8    many players in this case.

9    BY MR. LARSON:

10   Q.   How did that come to your attention?

11   A.   I first heard about Hemmer from FBI Agent Otis.

12   Q.   What did she tell you?

13             MR. KAKKAR:  Objection, your Honor.  Hearsay.

14             THE COURT:  Overruled.

15             THE WITNESS:  That -- that he may have been somebody

16   -- that he's somehow linked in.  You know, he represented

17   Whittington at some point and that he could possibly have been

18   the person who introduced the two of them, introduced David

19   Herrera.

20   BY MR. LARSON:

21   Q.   Let's move on back to the arrest.

22             MR. KAKKAR:  Your Honor, objection.  With respect to

23   that last statement could the jury be instructed to not use

24   that for the truth of the matter asserted?

25             MR. LARSON:  Strongly object, your Honor.

```
1              THE COURT:  Overruled.

2              MR. LARSON:  Thank you.

3    BY MR. LARSON:

4    Q.   Agent Hunter, you indicated that you were at the arrest of

5    Mr. Herrera?

6    A.   Yes, I was.

7    Q.   Tell the jury where that arrest took place.

8    A.   LAX, Los Angeles International Airport.

9    Q.   And you had an arrest warrant?

10   A.   Yes.

11   Q.   To your knowledge did Mr. Herrera have any idea that he

12   was going to be arrested on the day that he was arrested?

13   A.   I don't -- no, I have no knowledge.

14   Q.   To your knowledge?

15   A.   To my knowledge, yeah.

16   Q.   To your knowledge it was a complete surprise for Mr.

17   Herrera?

18   A.   Yes.

19   Q.   When you saw -- did you see Mr. Herrera when he was being

20   arrested?

21   A.   No.

22   Q.   Where were you?

23   A.   I was in a -- I think -- I'm not sure -- customs have

24   changed their name now, the Department of Homeland Security.

25   Q.   Now it's ICE, Immigration and Customs Enforcement?
```

1    A.   It's gone through a couple different metamorphosis.

2    Regardless of the name, we were -- he was inbound on an

3    international flight, so the rules were that we could not

4    effect the arrest.  The arrest would be done by a -- an agent

5    part of Homeland Security.

6    Q.   So he was, literally, arrested on the plane or as he got

7    off the plane?

8    A.   I'm not sure about that.

9    Q.   But that was handled by the ICE agents?

10   A.   Correct.

11   Q.   So the FBI had to wait, like, literally, right outside the

12   border as it were; is that correct?

13   A.   Outside the where?

14   Q.   The border.  You're, literally, waiting for him to be

15   released to your custody from customs, correct?

16   A.   That's correct.

17   Q.   The way it works -- an international airport is,

18   essentially, a border into the United States, correct?

19            MR. KAKKAR:  Objection, your Honor.  Foundation.

20            THE COURT:  Sustained.

21   BY MR. LARSON:

22   Q.   Are you familiar -- it's not an important part.

23            In any event, for whatever reason, the FBI can't go

24   into the airplane itself on an international flight; they have

25   to wait for customs to bring the person out?

```
 1              MR. KAKKAR:  Objection.  Vague as to time.

 2              MR. LARSON:  I'm talking about the arrest.

 3              THE COURT:  Hold on.  Overruled.

 4   BY MR. LARSON:

 5   Q.   So the AUSA understands, we're talking about the arrest of

 6   Mr. Herrera, correct?

 7   A.   That's correct.

 8   Q.   You understand that?

 9   A.   I understand that.

10   Q.   Okay.  So at that time the customs agents had to bring out

11   Mr. Herrera or someone from the international flight to the

12   FBI, correct?

13   A.   Yes.  The FBI has an office at Lax, so we coordinated

14   through their office.  And they have a relationship -- I want

15   to say it's CBP.  They're part of Homeland Security.  So all

16   this protocol.  This wasn't anything new.  It's all in place.

17   Q.   Okay.  So at some point in time the FBI took custody of

18   Mr. Herrera, correct?

19   A.   That's correct.

20   Q.   And when you arrest somebody, generally speaking, do you

21   do a search of their person?

22   A.   Yes, you do.

23   Q.   And you get their wallet or anything that's in their

24   pockets?

25   A.   Yes, you do.
```

1    Q.   What happens to that stuff that's in a person's pockets

2    when they're arrested by the FBI?

3    A.   Well, it depends on what stuff that is.

4    Q.   Okay.  Let's say it's a badge.

5    A.   A badge?

6    Q.   A badge.

7    A.   Okay.

8    Q.   What would happen to a badge?

9    A.   Well, if it was a badge, and the badge was supposed to be

10   a tool that was used to defraud people, then that is something

11   that would be retained as evidence.

12   Q.   Did you retain a badge in this case from Mr. Herrera?

13   A.   We -- yes.  There was a badge taken.

14   Q.   All right.  Do you know where on him the badge was?  Was

15   it in his pants pocket?  Was it in his coat pocket?  Do you

16   remember where?

17   A.   I do not.

18   Q.   All you know is that you got a badge?

19   A.   Correct.

20        MR. LARSON:  All right.  Your Honor, the Government

21   has maintained custody of said badge.  I would at this point

22   like to mark as our next exhibit that badge that I believe

23   Special Agent Otis has and present it to the witness.

24        THE COURT:  Is that in the custody of the agent at

25   this time, Mr. Kakkar?

UNITED STATES DISTRICT COURT

1          MR. LARSON:  It's currently --

2          MR. KAKKAR:  Yes, your Honor, it is.

3          THE COURT:  Very well.  Can you, please, obtain it

4     from the agent and hand it to defense counsel.

5          MR. KAKKAR:  Sure.

6          MR. LARSON:  What number are we, Mr. Behnke?

7          MR. BEHNKE:  570.

8          MR. LARSON:  570.  Your Honor, this will be Defense

9     Exhibit 570.

10          THE COURT:  Are you moving that into evidence?

11          MR. LARSON:  Although we'll, certainly, keep it --

12     the agent can keep it in her custody, and then if the jury

13     needs to see it, they can see it.

14          THE COURT:  Are you moving into evidence?

15          I guess you have to establish the foundation.

16          MR. LARSON:  Right.

17          THE COURT:  Mr. Galvez.

18          The witness has 570.  You may proceed.

19          (Exhibit 570 admitted.)

20     BY MR. LARSON:

21     Q.   Would you take a look -- just -- there's a couple

22     compartments there.

23     A.   Okay.

24     Q.   You recognize that, Mr. Hunter, as the badge that was

25     seized from Mr. Herrera?

```
 1   A.    I do not.  This -- this could be the first time I've seen
 2   this badge.  It doesn't -- I don't remember seeing this before.
 3   Q.    Did you see the badge that was seized from Mr. Herrera?
 4   A.    No.
 5   Q.    Oh, okay.  So you didn't see the badge that was seized
 6   from Mr. Herrera?
 7   A.    No.  I don't remember that.  We -- I didn't conduct the
 8   search of him.
 9   Q.    So somebody else conducted the search and you heard that a
10   badge was seized?
11   A.    Correct.
12   Q.    So you never saw the badge?
13   A.    No.
14   Q.    All right.  Oh, well, who took the badge?  Do you know?
15   A.    Well, the search -- to the best of my recollection the
16   search would have been done by Department of Homeland Security.
17   Q.    Okay.
18   A.    Okay.  So they took the property.
19   Q.    Do you know how it ended up with Special Agent Otis?
20   A.    I would assume that it went from Department of Homeland
21   Security to Agent Otis.
22             MR. LARSON:  Your Honor, could we approach sidebar?
23             THE COURT:  Yes.
24             (Outside The Presence Of The Jury:)
25             THE COURT:  Will you stipulate that the badge was
```

1    seized from Mr. Herrera at the airport?

2              MR. KAKKAR:  Yes.

3              MR. LARSON:  Okay.  That's --

4              MR. KAKKAR:  One note, though.  I apologize.  One

5    note.  But in terms of facts about where is it in the pocket,

6    was it searched, anything like that --

7              MR. LARSON:  Right.

8              MR. KAKKAR:  I just want to confirm.

9              (In the Presence of the Jury:)

10   BY MR. LARSON:

11   Q.   Special Agent Hunter, I will proffer to you that the

12   Government has stipulated that that is, in fact, the badge that

13   was taken by the searching officers and provided to Special

14   Agent Otis from Mr. Herrera.

15   A.   Sure.

16   Q.   All right.

17             MR. LARSON:  Is that so stipulated?

18             MR. KAKKAR:  So stipulated, your Honor.

19             MR. LARSON:  Okay.

20             THE COURT:  The parties have so stipulated, ladies

21   and gentlemen.

22   BY MR. LARSON:

23   Q.   At this time I'd ask you to take a look at -- this is

24   312-A.  I don't know if you can see this.  Does that appear to

25   be a picture of the badge that's in that?

93

1   A.   Yes, it does.

2   Q.   Okay.  Now, this is -- you -- do you recognize this as a

3   Drug Enforcement Administration badge?

4   A.   No, I can't.  I can't tell you.  I couldn't recognize a

5   DEA badge.

6   Q.   You've only had a FBI badge, right?

7   A.   Right.  And now I have a Treasury badge, but those are the

8   two.

9   Q.   And an FBI badge and a Treasury badge is different than a

10  DEA badge, right?

11  A.   Yes.

12  Q.   And this says *Drug Enforcement Administration, Retired*,

13  correct?

14  A.   Correct.

15  Q.   *Drug Enforcement Administration, Special Agent*, and the

16  two big letters in the middle of the shield are *U.S.*, correct?

17  A.   That's correct.

18  Q.   Now, an FBI badge is all gold, correct?

19  A.   Well --

20          MR. KAKKAR:  Objection, your Honor.  Vague as to time

21  and specifically what type of badge.

22  BY MR. LARSON:

23  Q.   Since J. Edgar Hoover created the shield, the FBI badge

24  has been all gold, correct?

25  A.   I don't think it's actually all gold.  You mean gold in

1    color?

2    Q.   I wasn't suggesting you were walking around with 14-carat

3    solid gold badges.

4    A.   That's correct, gold.

5    Q.   They're valuable, but they're not that valuable, right?

6         But badges are pretty valuable, right?  Your badge is

7    pretty valuable to you?

8    A.   I think most agents think they are, yes.

9    Q.   I just want to touch on that for a moment.  Most agents do

10   think that their badges are pretty important.  Why is that?

11   A.   It's a form of identification, plus it's -- you know, you

12   go through an academy.  It's a sense of pride to have a badge.

13   Q.   It's more than something -- I have a driver's license.

14   I'm not particularly proud of it, bad picture, but the badge

15   means something because of that sense of pride, correct?

16   A.   It does.

17   Q.   When you're at that academy -- you're referring to the FBI

18   academy back in Quantico, Virginia?

19   A.   Correct.

20   Q.   The DEA, they go to a different academy, correct?

21   A.   When I went through, DEA was at the same academy with us.

22   I couldn't tell you what they do today.

23   Q.   The FBI and the DEA are both part of the United States

24   Department of Justice, correct?

25   A.   I'm not exactly positive about the DEA.  I know the FBI

1    is.  These agencies have moved around so much now.

2    Q.    Some are over at Homeland Security?

3    A.    Secret Service, they've moved around.

4    Q.    The U.S. Attorneys, they're part of the Department of

5    Justice, correct?

6    A.    That's correct.

7              THE COURT:  Mr. Larson, let's take our lunch break at

8    this time.

9              Ladies and gentlemen, we'll be in lunch.  Please

10   remember my direction to you not to discuss this case even

11   amongst yourselves.  Do not let anybody else discuss this case

12   with you.  Do not let any -- do not do any research or in any

13   other way try to learn about this case.  Keep an open mind

14   about the issues in this case.

15             Let's be back by 1:30.

16             (Outside The Presence Of The Jury:)

17             MR. KAKKAR:  Your Honor, before the witness steps

18   down, can we ask him to bring the badge back?

19             THE COURT:  Yes.

20             (Lunch recess.)

21             (Outside The Presence Of The Jury:)

22             THE COURT:  Please be seated.  Very well.  Do we have

23   issues?

24             MR. LARSON:  I'm sorry, your Honor, not from the

25   defense.

1          MR. YANG:  Just one minor issue.  The defense has

2    agreed to allow the Government to have Special Agent Mark

3    Hunter read the deposition transcripts.  If they're not

4    available by today, then we'll just hold off for that reading

5    on Tuesday.

6          THE COURT:  Very well.  So my intended ruling on that

7    is -- to the extent the defense objects on, you know, hearsay

8    and confusing and cumulative, I will deny those objections, but

9    I will grant their request for enlargements where they make

10   them.  So if you can prepare that transcript with the

11   enlargements, we can either read it today or tomorrow, but

12   that's my ruling.

13         MR. YANG:  Your Honor, I think as a practical matter,

14   we'll not be able to combine it given we're all present here.

15         THE COURT:  Very well.  So are you ready to proceed

16   then?

17         MR. LARSON:  Yes, your Honor.

18         THE COURT:  Ms. Meister, please do not walk in the

19   well.  Go around if you want to speak.

20         MS. MEISTER:  My apologies.

21         (In the Presence of the Jury:)

22         THE COURT:  Very well.  Please be seated.

23         Agent, you understand that you are still under oath,

24   sir?

25         THE WITNESS:  Yes, I do.

1          THE COURT:  Counsel, you may proceed.

2    BY MR. LARSON:

3    Q.   Good afternoon, Mr. Hunter.  We were discussing, before

4    the break -- or before lunch, the badge.  Do you have that

5    there in front of you?

6    A.   Yes, I do.

7    Q.   Okay.  And so we've so stipulated this was the badge that

8    was seized from Mr. Herrera.

9          Your Honor, at this time I'd ask -- I'd move to admit

10   Exhibit 570 based on the stipulation and the testimony.  I'd

11   also ask the badge be published for the jury it see.

12          THE COURT:  How do you intend to publish it?

13          MR. LARSON:  Given that it's as small as it is, I was

14   going to propose maybe it could be handed one to other so they

15   can pass it and take a look at it.

16          THE COURT:  Is there an objection to that?

17          MR. KAKKAR:  No objection, your Honor.

18          THE COURT:  Very well.  Mr. Galvez.

19          THE COURTROOM DEPUTY:  Exhibit's admitted?

20          THE COURT:  It's admitted, yes.

21          (Exhibit 570 admitted.)

22   BY MR. LARSON:

23   Q.   Actually, before we do that, why don't we just -- go

24   through the badge.  There's four compartments to it, just so

25   the jury understands what they're seeing.  Let's start with the

1    badge itself.  I think I showed you a blown-up picture of it.

2    The badge itself has the badge in the case, Drug Enforcement

3    Administration, and it's got the gold-colored badge, correct?

4    A.    That's correct.

5    Q.    With the blue?

6          All right.  Then on the flip side of that there's a

7    little compartment.  What does that have in it?

8    A.    This has Department of Consumer Affairs, Private

9    Investigator.  It looks like a little PI card.

10   Q.    You can go ahead and read the whole thing.

11   A.    Okay.  Sure.  Call Manager President of Herrera

12   Investigation Services, Inc., David G. Herrera, 2390 Crenshaw

13   Boulevard, number 811, Torrance, California, zip code 90501,

14   license number PI 205203, expires October 31st, 2014.  And then

15   there is a signature line.

16   Q.    Just to be clear, this was seized prior to October of

17   2014, correct?  The arrest took place prior to October of 2014?

18   A.    I don't have that date right off the top of my head.

19   Q.    All right.  Let's flip to the other side of the badge,

20   then, or the credential.  What does that have?

21   A.    Okay.  This has his credentials, has a credential number

22   in the upper right-hand corner.  And then it says *Drug*

23   *Enforcement Administration, United States Department of*

24   *Justice, Retired*, and then it's got *DEA* in big light blue

25   lettering, and then *David G. Herrera*.  And it says in small

1  writing, *This is to certify that David G. Herrera, whose*

2  *signature and photograph appear below, is duly appointed as a*

3  *Supervisory Special Agent in the Drug Enforcement*

4  *Administration United States Department of Justice.*

5  Q.   Does that help refresh your recollection that the Drug

6  Enforcement Administration is part of the U.S. Department of

7  Justice?

8  A.   It sure does.

9  Q.   So it's just a brother agency within the Department of

10 Justice, correct?

11 A.   Yes.

12 Q.   Like brothers, there's sometimes a rivalry between them?

13         MR. KAKKAR:  Objection, your Honor.  Speculative.

14         THE COURT:  Sustained.

15         MR. LARSON:  All right.  At this time, your Honor, if

16 the badge could be provided to the jurors?

17         THE COURT:  Mr. Galvez, hand it to juror number one

18 and then juror number one will pass it along.

19         Very well.

20 BY MR. LARSON:

21 Q.   Sir, do you have any reason at all to believe that these

22 are not the retired DEA badge and retired DEA credentials

23 provided to Mr. Herrera when he completed his career with the

24 DEA?

25 A.   No.

1    Q.    Just a couple more areas.

2          Special Agent Otis can take the badge back.

3          THE COURT:  Mr. Galvez, can you hand that back to the

4    case agent, please?

5    BY MR. LARSON:

6    Q.    You're familiar, of course, with the investigative

7    technique of a search warrant, correct?

8    A.    Yes.

9    Q.    Explain just briefly, very briefly, to the jury what a

10   search warrant is?

11   A.    A search warrant is when you -- usually the case agent,

12   but one of the investigating agencies will put together an

13   affidavit.  They'll take it before a magistrate and have it

14   sworn out.  And then when you get the search warrant, you're --

15   let's say it's on a residence.  Then you'll go out to the

16   residence and knock on the door and execute the search warrant.

17   Q.    In your experience in executing search warrants, both as

18   an FBI agent and as a federal agent, do you do a pretty

19   thorough job of searching whatever it is you're authorized to

20   search?

21   A.    Yes.

22   Q.    It's not just one person going out for a normal search

23   warrant; there's normally many agents that go out; is that

24   correct?

25   A.    Yeah.  It depends on the size of the location.  Obviously,

1    if it's a one-bedroom house, you don't need as many people as

2    you do for an office building.

3    Q.   And the search warrant affidavit itself, that's an

4    important document?

5    A.   Yes, it is.

6    Q.   As an agent, if you were filling out an affidavit, you

7    would make sure that what you put in that affidavit is true and

8    accurate, correct?

9    A.   To the best of your knowledge.

10   Q.   Best of your knowledge, okay.

11         Now, there were search warrants executed related to

12   the overall investigation of Jerry Whittington, correct?

13         THE WITNESS:  Sorry.  Repeat that again, Counsel.

14   BY MR. LARSON:

15   Q.   To your knowledge of this investigation of Jerry

16   Whittington -- this whole -- this case, the investigation

17   involved more than just Mr. Herrera, correct?

18   A.   You mean there were other defendants; is that what you're

19   saying?

20   Q.   Yes.

21   A.   Yes.

22   Q.   The investigation of Jerry Whittington and all the various

23   fraud schemes that he's been charged with and pled guilty to,

24   in that investigation -- I'm talking about the bigger

25   investigation -- there have been search warrants executed by

1    the agents in this case, correct?

2    A.    Correct.

3    Q.    And you're aware that there were search warrants executed

4    of homes, email account, telephones, storage units; is that

5    accurate?

6    A.    Yes.   That's accurate.

7    Q.    And items were seized and taken into FBI custody as a

8    result of those search warrants, correct?

9    A.    Yes.

10   Q.    And Special Agent Otis would have access to any evidence

11   seized pursuant to these FBI search warrants, correct?

12           MR. KAKKAR:   Objection, your Honor.   Speculation.

13           THE COURT:   Sustained.

14   BY MR. LARSON:

15   Q.    As the case agent?

16           MR. KAKKAR:   Same objection.

17           THE COURT:   Sustained.

18   BY MR. LARSON:

19   Q.    When you were working on this case, did you have access to

20   any of the evidence that was seized pursuant to the search

21   warrants in this case?

22   A.    Yes.

23   Q.    Another investigative tool is handwriting analysis,

24   correct?

25   A.    Yes.

1   Q.   Okay.  You're familiar with the Questioned Documents Unit

2   of the FBI laboratory?

3   A.   Yes, I am.

4   Q.   Would you describe to the jury what the Questioned

5   Documents Unit of the FBI laboratory is?

6   A.   That's a unit that you can send items to to have them

7   analyzed for, say, handwriting, for example, you know, of

8   somebody's handwriting, document reviews.

9   Q.   And it's been in existence for a very long time, right?

10  A.   I think it's changed names, but it's -- some form of it's

11  been around since I jointed the FBI, that's for sure.

12  Q.   The Lindberg case was one of the famous cases solved by

13  the FBI Questioned Document Unit or whatever it was called,

14  isn't it?

15  A.   That I'm not familiar with.

16  Q.   Okay.  You're, certainly, aware that the FBI has a

17  laboratory, whatever its name, dedicated to comparing

18  handwriting to determine if they can figure out who wrote

19  something, correct?

20  A.   That's correct.

21  Q.   And in this case isn't it true that on October 16th of

22  2014 Mr. Herrera provided you a handwriting exemplar?

23  A.   That is correct.

24  Q.   Okay.  Explain to the jury what a handwriting exemplar is.

25  A.   Handwriting exemplar is when an individual comes in and

1    then you will give them blank pieces of paper, for example, and

2    you will give them things to write.  Maybe you'll have them

3    write -- sign their name multiple times, examples of filling

4    out a checkbook, things like that.  So you're getting known

5    writings exemplars from the individual.

6    Q.   And you recall Mr. Herrera came down with his wife, Rosa,

7    to your office to provide the handwriting exemplar; is that

8    correct?

9    A.   They came down to the FBI office.

10   Q.   You went over to the FBI office.

11        Was Special Agent Otis there?

12   A.   Yes, she was.

13   Q.   Okay.  So you went over to her office.  And Mr. Herrera

14   and Mrs. Herrera came down, and Mr. Herrera provided his

15   handwriting exemplar?

16   A.   He did.  That's correct.

17   Q.   Was that -- was a handwriting analysis ever performed by

18   the FBI questioned document laboratory?

19        MR. KAKKAR:  Objection, your Honor.  Speculation.

20        THE COURT:  Sustained.

21   BY MR. LARSON:

22   Q.   Do you know whether an FBI handwriting analysis was ever

23   performed after you obtained the handwriting exemplar?

24   A.   To my knowledge one was never done.

25   Q.   You were in the Palm Springs office for eight years?

1    A.    Yeah, approximately.  Yes.

2    Q.    Do you know whether there is a Costco in Palm Springs, in

3    the city of Palm Springs?

4    A.    Ah, there's only two in the desert that I know of and

5    neither one of them are in Palm Springs.

6    Q.    Right.  There's one in Palm Desert and one in Rancho

7    Mirage, correct?

8    A.    No.  There's one on the Rancho Mirage/Palm Desert border

9    and the other is in La Quinta.

10   Q.    La Quinta, I'm sorry.  But there's no Costco in the city

11   of Palm Springs?

12   A.    Not that I'm aware of.

13   Q.    You understand that Jerry Whittington has entered into a

14   plea agreement in this case?

15   A.    Yes.

16   Q.    He's pled guilty to a whole bunch of fraud schemes,

17   correct?

18   A.    That is correct.

19   Q.    And pursuant to that plea agreement he entered into a

20   contract with the Government to provide substantial assistance

21   or to cooperate, correct?

22   A.    A cooperation agreement, yes.

23   Q.    That cooperation agreement, to your knowledge, requires

24   him to appear and testify truthfully as requested by the

25   Government, correct?

 1              MR. KAKKAR:  Objection, your Honor.  Speculation and

 2    foundation.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Could you repeat it, Counselor?

 5    BY MR. LARSON:

 6    Q.   Yes.  That cooperation agreement requires Mr. Whittington

 7    to appear and testify truthfully as requested by the

 8    Government, correct?

 9    A.   I'm not intimately aware of all the details in that

10    agreement.

11    Q.   You've worked with cooperating defendants before in your

12    career, haven't you, Mr. Hunter?

13    A.   Yes.

14    Q.   And you understand that when a defendant enters into a

15    cooperation agreement, that part of what they do is testify at

16    trials for the Government?

17    A.   Yeah.  Not all the time that you enter into a cooperation

18    agreement do you end up testifying.

19    Q.   But if the Government wants them to testify, they testify?

20    A.   Usually, yes.

21    Q.   What's the mandatory retirement age for FBI agents?

22    A.   57.

23              MR. LARSON:  Nothing further, your Honor.

24              THE COURT:  Very well.  Redirect.

25              MR. KAKKAR:  Your Honor, may I hand this to defense

```
 1   counsel?
 2           THE COURT:  You may confer.
 3                   REDIRECT EXAMINATION
 4   BY MR. KAKKAR:
 5   Q.   Special Agent Hunter, when you just mentioned the Palm
 6   Desert/Rancho Mirage border, are those two cities in the Palm
 7   Springs area?
 8   A.   Yes, they are.  They're two cities out in the Coachella
 9   Valley area.
10   Q.   Are the boundaries clear amongst those cities in your
11   experience?
12   A.   No, they're not.  It's very confusing out there.  A lot of
13   times it's divided, literally, by the middle of the street in
14   some areas.
15   Q.   Now, do you remember testifying about the bank records,
16   the Exhibits 9 and 15, on direct and on cross?
17   A.   Yes.
18   Q.   And was your testimony based on your reading the records
19   that were in front of you?
20   A.   Yes.
21           MR. KAKKAR:  Your Honor, may I grab something from my
22   table?
23           THE COURT:  Yes.
24   BY MR. KAKKAR:
25   Q.   Special Agent Hunter, do you recall testifying about the
```

1   indictment that counsel showed you?

2   A.    I do.

3   Q.    And do you recall testifying or -- do you recall

4   discussing these counts and these dates?

5   A.    Yes.

6   Q.    Was your testimony based on just reading these dates in

7   court?

8   A.    When looking at the grand jury -- the indictment?

9           MR. LARSON:   Objection.   Vague.   I'm not sure which

10  testimony he's referring to, your Honor.

11          THE COURT:   Sustained.

12  BY MR. KAKKAR:

13  Q.    Agent Hunter, during cross-examination, when you were

14  answering defense counsel's questions about the dates on this

15  indictment, was your testimony based on reading this indictment

16  in court?

17  A.    Yes.

18  Q.    Do you see these dates charged in this indictment on page

19  -- what's marked as 12 of 17?

20  A.    Yes, I do.

21  Q.    And what I'll represent is page 11 of 17, in paragraph

22  proceeding, when you read *On or about the dates set forth*

23  *below*, is it your understanding that that modifies those dates

24  in the table on the next page?

25  A.    Yes.

1    Q.    Special Agent Hunter, did you write that document?

2    A.    The indictment?

3    Q.    Yes.

4    A.    No.

5    Q.    And after a charging document is issued in this, in your

6    experience do you still continue investigation on the case?

7    A.    Yes.

8    Q.    Do you recall your testimony that it was not unusual for

9    your colleagues who had retired to become private

10   investigators?

11   A.    I do remember that.

12   Q.    And do you recall your testimony with counsel about the

13   value of the badge that it has for you?

14   A.    Yes.

15   Q.    Agent Hunter, when did you retire from the FBI?

16   A.    May of 2012.

17   Q.    And did some of your colleagues retire around the same

18   time you did?

19   A.    Yes.

20   Q.    Did some of those colleagues retire -- excuse me.

21          Did some of these colleagues become private

22   investigators?

23   A.    Yes.

24   Q.    And so when you were answering counsel's questions about

25   your knowledge of private investigators, was that part of your

1    understanding of private investigators?

2    A.    Yes.

3    Q.    Can -- based on that understanding, can private

4    investigators run criminal history checks?

5           MR. LARSON:  I misunderstood the question.

6           THE COURT:  Can private investigators run criminal

7    history checks?

8           MR. LARSON:  Thank you.

9           THE WITNESS:  I think it depends -- yes, depending on

10   the nature of what they were running them for, but I think they

11   have access to some databases.

12   BY MR. KAKKAR:

13   Q.    Now, based on your knowledge of private investigators, do

14   you know if any of your colleagues that became private

15   investigators, if any of them used their badge to get business?

16   A.    Well --

17          MR. LARSON:  Objection.  Foundation, your Honor.

18   Relevancy.

19          THE COURT:  Overruled on foundation.  Relevancy?

20   I'll let in this question.

21          You may proceed.

22   BY MR. KAKKAR:

23   Q.    Agent Hunter, do you know if any of your colleagues that

24   became private investigators used their badge to get business?

25   A.    My answer would be no.  And let me explain a little bit.

1   In the FBI, when you retire, you will be issued retirement

2   credentials, but you're not issued a retirement badge.

3           MR. KAKKAR:  Okay.  Your Honor, may I ask the

4   question and apply it specifically to that case.

5           MR. LARSON:  Your Honor, could I have a sidebar on

6   this?

7           THE COURT:  Yes.

8           (Outside The Presence Of The Jury:)

9           THE COURT:  So --

10          MR. LARSON:  The foundation issue is that they should

11  know this, that FBI agents, unlike DEA agents, don't get a

12  badge.  That's just wrong.

13          THE COURT:  It's only relevant if the procedures are

14  the same.  If you know the procedures are different, then the

15  fact that the FBI agents don't get a badge has no relevance.

16          MR. KAKKAR:  So I -- your Honor, I understand.

17  However, defense counsel went into a line of questioning about

18  what Special Agent Hunter's knowledge of his badge is and he

19  didn't have a DEA badge.

20          THE COURT:  But it's relevance.  How is it relevant

21  that FBI agents don't get a badge?

22          MR. KAKKAR:  Well --

23          MR. LARSON:  It's more; it's misleading.  It's -- I

24  elicited testimony -- he asked the question and he set this up

25  very carefully.  He says, you know, do you have -- is it based

1    in part on FBI agents who have retired, so he limited the

2    universe.  And then he says, Do you use the badge?  The

3    witness, to his credit, gave a qualified answer and said no,

4    but I've got to explain is because we don't get no stinking

5    badges.  That is -- this jury has been misled.

6              THE COURT:  I understand.  I understand.

7              MR. KAKKAR:  Your Honor, if I could ask the question

8    to answer it based on his knowledge of agents who have retired

9    that get retired badges.

10             MR. LARSON:  I submit it's too late for that.  This

11   should be stricken, and the jury should be -- this is wrong.

12             MR. KAKKAR:  Your Honor, there's no misleading

13   because the witness has actually clarified badge versus

14   credential.

15             MR. LARSON:  An Assistant United States attorney

16   should know this before he starts bringing a case about a

17   badge.

18             THE COURT:  Okay.  Go on to the next question.  We'll

19   discuss some kind of remedy if I look at the transcript and I

20   think something's been wrong.  But it is potentially misleading

21   what you're doing.  If you're eliciting from this witness that

22   FBI agents don't get a badge, it implants a suggestion that DEA

23   agents don't get a badge.

24             MR. KAKKAR:  Can I ask a curative question?

25             THE COURT:  What curative question?

1          MR. KAKKAR:  Is it your understanding -- -

2          MR. LARSON:  I would rather the cure come from the

3    Court.

4          THE COURT:  What curative question do you want to

5    ask?

6          MR. KAKKAR:  The question I'd ask is is it your

7    understanding that other agencies provide their retired agents

8    with badges?

9          MR. LARSON:  The problem is we already got an answer

10   out there in the negative.  This goes to the heart of the case,

11   your Honor.

12         MR. KAKKAR:  The answer goes directly -- the answer

13   is very clear that it just pertained to FBI agents.  It's

14   undisputed that the defendant was a DEA agent.

15         THE COURT:  I think that's right.  You should cure

16   whatever you want and when you can move on to another topic.

17         MR. LARSON:  Thank you.

18         (In the Presence of the Jury:)

19   BY MR. KAKKAR:

20   Q.   Agent Hunter, is it your understanding that other agencies

21   give badges to their retired agents?

22   A.   Yes.

23   Q.   And so your testimony was specifically related to FBI

24   agents who retired?

25   A.   Correct.

1    Q.   So going back to your testimony about retired agents who

2    become private investigators, your knowledge of those private

3    investigators, do you know if any of them have -- have

4    solicited business with people in custody?

5    A.   No, not to my knowledge.

6              MR. LARSON:  Objection, your Honor.  Relevancy on

7    this.  This one particular agent, whether he knows in his

8    limited universe whether someone has solicited that kind of --

9              THE COURT:  I understand the objection.  Let's move

10   on.

11             MR. KAKKAR:  No further questions, your Honor.

12             THE COURT:  Very well.  Any recross?

13             MR. LARSON:  I don't think there's any at this time.

14   I would ask the Court to consider defense's request at sidebar.

15             THE COURT:  Mr. Hunter, you may step down.

16             THE WITNESS:  You want me to just leave these

17   exhibits?

18             THE COURT:  Yes.

19             Mr. Yang, Mr. Kakkar, your next witness.

20             MR. YANG:  Your Honor, the United States calls Wendy

21   Driscoll to the stand.

22             THE COURT:  Ms. Driscoll, come forward.

23             THE COURTROOM DEPUTY:  Please stand and raise your

24   right hand.

25             Do you solemnly swear the testimony you're about to

1  give in the cause now before this court will be the truth, the

2  whole truth, and nothing but the truth so help you God.

3             THE WITNESS:  Yes, I do.

4             THE COURTROOM DEPUTY:  Please have a seat.  Please

5  state your full name and spell your first and last name.

6             THE WITNESS:  Wendy Driscoll, W-e-n-d-y,

7  D-r-i-s-c-o-l-l.

8             THE COURT:  You may proceed.

9             MR. YANG:  That you were.

10            **PLAINTIFF'S WITNESS, WENDY DRISCOLL, WAS SWORN**

11                       **DIRECT EXAMINATION**

12  BY MR. YANG:

13  Q.   Ms. Driscoll, what is your occupation?

14  A.   I'm a court reporter.

15  Q.   How long have you worked as a court reporter?

16  A.   16 and a half years.

17  Q.   What certifications do you hold?

18  A.   Um, a certified shorthand reporter certification and a

19  certification to work in the courthouse in Ventura County.

20  Sorry.  I'm nervous.  I haven't been in this spot before.

21            So in Ventura County they require you to take a test

22  to work in their courthouse, so I have a certification with

23  them.

24  Q.   And can you describe what you do as a court reporter?

25  A.   Um, we listen to what people say, make sure that we